## No. 10611.

### OLIVEROS v. HENDERSON (Two Cases)
### TERWILLIGER v. HENDERSON

(106 S. E. 865)

1. JUDGES—JUDGE NOT DISQUALIFIED FOR BIAS BY ATTENDING CHURCH MEETING CONSIDERING LAW VIOLATIONS.—In an action for slander and libel by parties prosecuted for violation of the Sunday law *held* that a presiding judge, who was present at a church meeting, where it was determined to enforce such law, but who refused because of his official position to be placed on committees or take any active part therein, was not disqualified.

2. PLEADING—DEMURRERS TO COMPLAINT ADMIT FACTS, BUT NOT INFERENCES DRAWN THEREFROM.—Demurrers to a complaint admit facts alleged therein, but do not admit inferences drawn by plaintiffs from such facts, and it is for the court to determine as to whether or not such inferences are justifiable.

3. LIBEL AND SLANDER—WORDS USED MUST BE GIVEN ORDINARY POPULAR MEANING, UNLESS DEFENDANT HAS MADE THEM MEAN OTHERWISE.—In determining whether words are libelous or slanderous, they must be given their ordinary popular meaning, unless the defendant at the time such words were used, so modified or explained them as to give them a different meaning.

4. LIBEL AND SLANDER—"LIBEL PER SEE" AND "LIBEL PER QUOD" DISTINGUISHED.—A "libel per se" is one actionable on its face; a "libel per quod" is one not actionable upon its face, but which becomes so by reason of the peculiar situation or occasion upon which the words are spoken or written.

5. LIBEL AND SLANDER—FAIR CRITICISM OF JUROR'S WORK, WITHOUT ATTACKING CHARACTER, REPUTATION OR MOTIVES, IS NOT DEFAMATION.—While jurors performing their duty are entitled to full

protection from unwarranted attacks upon their character, reputation, or motives by persons disgruntled or dissatisfied by any verdict, yet fair and just criticism of their work in discharge of duty is in the interest of the administration of justice and of sound public policy, and when such criticism is fair and just and confined to their work, and does not attack their moral character or integrity, there is no defamation.

6. LIBEL AND SLANDER—WHEN CRITICISMS OF JURORS CEASE TO BE FAIR AND HONEST AND BECOME LIBELOUS IS USUALLY A JURY QUESTION.— The question whether criticisms and statements about jurymen cease to be fair and honest and become libelous is usually a question for the jury, and can rarely, though occasionally, be decided on a demurrer.

7. LIBEL AND SLANDER—PUBLICATION REGARDING JURY'S ACTION HELD NOT LIBELOUS, AND COMPLAINT HELD TO STATE NO CAUSE OF ACTION. —A published article, alleged to cast aspersions on the verdict of a jury, signed by several citizens for the announced purpose of giving the public the facts in a prosecution for violation of the Sunday law, *held* not libelous per se, and, where the complaint failed to allege any extrinsic matter making the publication libelous, no cause of action was stated.

8. LIBEL AND SLANDER—STATEMENT THAT PLAINTIFFS WERE "OUTLAWS" CONSTRUED TO MEAN ONLY THAT THEY WERE VIOLATING SUNDAY LAW.—A published account of a criminal trial for violation of Sunday closing law, containing a statement of a witness that plaintiffs were outlaws, an outlaw being one excluded from the benefits of the law and deprived of its protection, which, while standing alone, might be libel per se, *held,* in connection with the account of the trial, to mean no more than that plaintiffs were violating the law, and not to constitute libel.

9. LIBEL AND SLANDER—TESTIMONY OF A PARTY HELD PRIVILEGED.— The testimony by defendant in a libel suit, when a witness in a criminal prosecution and on cross-examination, was privileged.

10. LIBEL AND SLANDER—A PRIVATE INDIVIDUAL MAY PUBLISH COURT PROCEEDINGS.—A private individual has the same right as a newspaper to publish proceedings of courts, but such report must be accurate, fair and impartial, not garbled, added to, or taken from, nor used to injure the reputation or business of another.

11. LIBEL AND SLANDER—PUBLICATION OF COURT PROCEEDINGS OVER PARTY'S OBJECTION NOT MALICIOUS LIBEL.—If defendants, in an action for libel, had a right to publish court proceedings, the fact that defendants published such proceedings over the objection of the plaintiffs is insufficient to fix a charge of malicious libel on the publishers.

12. LIBEL AND SLANDER—NO PRESUMPTION OF MALICE FROM THE PUBLI-
CATION OF COURT PROCEEDINGS OVER PARTY'S OBJECTION.—A publica-
tion of court proceedings over objection of a party is prima facie
not libelous, and there is no presumption of malice therefrom.

13. LIBEL AND SLANDER—PUBLICATION THAT RED CROSS RECEIVED TAINT-
ED MONEY FROM PLAINTIFFS HELD NOT LIBELOUS.—In a civil action
for libel, a publication, alleged to have injured plaintiffs in busi-
ness and reputation, stating that the Red Cross does not knowingly
accept tainted money, held not intended by the signers of the arti-
cle to charge the plaintiffs with being engaged in any corrupt, rep-
rehensible, or illegal avocation, or contrary to morality, where it is
stated that plaintiffs had paid the proceeds from business done on
Sunday to the Red Cross, and where plaintiffs admit that such
money was made or earned contrary to and in violation of Sunday
closing law (Cr. Code 1912, §§ 698, 699,) there is no cause of
action.

14. SUNDAY—SALES OF ICE CREAM AND CIGARS NOT WORK OF CHARITY,
THOUGH PROFITS ARE GIVEN TO CHARITY.—Sales of ice cream or
cigars are neither a work of necessity or charity, within Cr. Code
1912, § 698, nor are they excused where the money received there-
from is devoted to Red Cross or other charitable work.

Before RICE, J., Aiken, June term, 1920. Affirmed.

Separate actions by L. M. C. Oliveros, Louis D. Oliveros
and William Terwilliger against C. K. Henderson. From
an order sustaining a demurrer to the complaint in each
action the several plaintiffs appeal.

The decree of the trial Judge, H. F. Rice, was as fol-
lows:

The above-stated causes are actions for slander and libel,
instituted by the plaintiff against the defendant Henderson.

In the cases of Terwilliger and Louis D. Oliveros two
causes of action are set out. In the other four cases only one
cause of action is set out in the complaint.

The matter came before me at the summer term of Court
for Aiken county, 1920, upon demurrer by the defendant
to all the causes of action set out in the complaints, upon the
ground that the same did not state facts sufficient to con-
stitute causes of action.

In the month of February, 1920, Louis D. Oliveros and William Terwilliger were operating an ice cream parlor and cigar store in the city of Aiken, and were tried before Magistrate W. B. Raborn upon a warrant, which complaint alleges was sworn out by C. K. Henderson, charging them with violation of sections 698 and 699 of the Criminal Code of South Carolina.

The case was tried by a jury and resulted in acquittal of the defendants. Thereafter, the complaint alleges, there was published in one of the newspapers of the city of Aiken what was purported to be an account of the trial and matters connected therewith. When the cases were called for hearing, it was suggested by counsel for the plaintiffs that the Court was disqualified to hear the cases, upon the grounds that the now presiding Judge was present at a meeting at the Baptist Church in which the matter of prosecuting the violators of the Sunday law was discussed, and that the Court had participated in said discussion and meeting. The said grounds will be more fully disclosed by an affidavit filed along with the record in this case and made by W. M. Smoak, one of the attorneys.

The attorneys for the defendant insisted strenuously that there be no delay in the hearing of the causes, and that there was absolutely no grounds for the claim of the plaintiffs that the presiding Judge should declare himself disqualified. As a matter of fact, on the occasion in question the now presiding Judge was present at the Baptist Church in the city of Aiken, at one of the regular Sunday services, and, after the usual sermon and other exercises were over, but the congregation still sitting in their seats, and before being dismissed, the matter was brought up by either the minister or some member of the church—exactly who I cannot recall—and the matter was discussed while the presiding Judge was sitting in the same seat in which he had listened to the sermon, and it was suggested by one of the deacons of the church that the now presiding Judge

should serve as a member of a committee to be appointed to look into the matter of the observance of Sunday law in the city of Aiken.

The now presiding Judge plainly and unequivocally refused to have his name put upon any such committee, and stated openly and plainly that on account of his official position he could have nothing to do with any such movement. He took no part whatsoever in the discussion, either for or against it, or in any other way.

Neither of the plaintiffs nor the defendant have ever been in any sense intimate with the present presiding Judge, nor have any of them been connected with him in business or any other way; all of them are friends of the presiding· Judge, but none of them no more than any of the others. So far as he can recall, not one of them has ever been in his home, with the exception of Mr. L. M. C. Oliveros, who was there on one or two occasions on business; nor has he, the presiding Judge, ever been, so far as he can recall, in the home of any one of the parties to said cause, and he has lived in the city of Aiken now for more than 16 years.

After a full consideration of the whole proposition he felt, and still feels, that there was absolutely nothing in the suggestion that he might be disqualified, and to refuse to hear these demurrers would be to shirk a plain duty which he was under oath to perform, unpleasant though it might be to undertake to decide differences among men all of whom he looks upon as his friends.

I have given this matter considerable study, and have endeavored to apply the law to the cases.

The demurrers admit the facts alleged in the complaint, but do not admit the inferences drawn by plaintiffs from such facts, and it is for the Court to determine as to whether or not such inferences are justifiable; that is, to determine if the language used in the publication can fairly or reasonably be construed to have the meaning attributed to it by the plaintiff.

6—s. c. 116

Libelous or slanderous matter, spoken or written, belongs to one of two classes—per se and per quod.

In determining whether words are libelous or slanderous, they must be given their ordinary, popular meaning, unless, however, the defendant, at the time such words were used, modifies or explains the meaning which he gives them to mean something other than their ordinary, popular meaning.

A libel per se is one which is actionable on its face. A per quod libel, however, is one not actionable on its face, but becomes so by reason of the peculiar situation or occasion upon which the words are spoken or written.

As stated in 13th Ency. Pleading and Practice, and adopted in *Hubbard v. Furman University,* 76 S. C. 510, 57 S. E. 478:

"If the alleged defamatory words are not actionable on their face, but derive their defamatory import from extrinsic facts and circumstances, such extrinsic facts and circumstances must be set forth and connected with the words charged by a proper averment."

We will first consider the cause of action of the plaintiffs, J. Conrad Dobey, Joseph P. Logan, and Arthur M. Weeks. The publication complained of, and which the said plaintiffs claimed is libelous, is set out, in part at least, in the complaints in the said cause. Dobey, Logan, and Weeks were three of the jurors that tried the aforesaid cause in the Magistrate's Court. An examination of the publication will show that it can hardly be said that it is a criticism of the conduct of the said jurors. It is certain that nowhere in the said publication is there any direct criticism of these jurors, and certainly no direct charge that they were actuated in any degree by any improper motive in returning the verdict which they did, Therefore, if it can be construed a criticism of their work

as jurors, it can be done so only by inference, but if it be construed as a criticism, then the question, which is a very far-reaching, important one, comes squarely up before the Court as to whether or not the public has a right to criticize the verdict of a jury.

Jurors do not voluntarily assume their duties, but are required by the law to serve. This being so, there can hardly be two opinions about the proposition that in performing their duty they are entitled to full protection from unwarranted attacks upon their character, reputation, or motives by persons disgruntled or dissatisfied by any verdict which they might render; but are they, by virtue of their positions as jurors, to be held free from all criticisms, no matter how unjustifiable their verdicts may be? I find it impossible for an instant to entertain the affirmative of this proposition. If a Circuit Judge commits error or does a legal wrong, there is a higher Court to set the matter right, but when a petit jury goes wrong by freeing a criminal against all the evidence and the law there is no remedy save by an indignant public opinion, such as may tend to prevent a repetition of such verdict.

I want it distinctly understood at this point that neither directly nor by insinuation do I mean to apply the word "criminal" to either of the young men who were tried in the Magistrate's Court, nor do I intend any language used above in reference to verdicts of jurors generally to be applied to the verdict rendered by the jury in the Magistrate's case above referred to. Young Louis Oliveros I have known practically all of his life and I hold him in the highest regard. Terwilliger I have known for only a short time, but have never heard aught against his character. Fair and just criticism of a juror's work in the discharge of his duty is in the interest of the administration of justice and a sound public policy, and when such criticism is fair and just, then there is no defamation.

As is said in *Bearce v. Bass,* 88 Me. 521, 34 Atl. 411, 51 Am. St. Rep. 446, quoted in the dissenting opinion of Mr. Justice Watts in the case of *Black v. State Company*: "So long * * * as the criticism is confined to a man's work, and does not attack the moral character or professional integrity of the individual, and is fair and reasonable, there is no libel because there is no defamation of the man himself. But, when the comments or criticism of a man's work becomes an attack on his private or business character, then the element of malice comes in and stamps the language as libelous."

It may be true, as stated in *Black v. State Co.,* supra, 93 S. C. at page 475, 77 S. E. at page 54 (Ann. Cas. 1914C, 989) that "the question when criticism and statements cease to be fair and honest, and become libelous, is usually for the jury and can rarely be decided on demurrer," but in the intsant cases I do not think this can apply, and if this be the law with reference to criticism of the verdicts of jurors, then it is dangerous indeed to make any criticism whatsoever upon a juror's work, where the speaker or writer does not approve of it, because, no matter how honest or lacking in malice such criticism or comment may be, any one making any such comments will be liable to an action for slander or libel, and be put to the expense and trouble of defending such action before a jury.

We should not forget, too, as is set out in *Mayrant v. Richardson,* 1 Nott & McC. 347, 9 Am. Dec. 707: "That freedom of speech is the necessary attribute of every free government."

In the dissenting opinion of Mr. Justice Watts in *Black v. State Company,* supra, we find the following taken from *MacDonald v. Sun Printing & Publishing Association,* 45 Misc. Rep. 441, 92 N. Y. Supp. 37, and I think this language, which was applied to public officers, also applies with equal force to jurors: "The people are not obliged to speak of the conduct of their officials in whispers or in bated

breath in a free government, but only in despotism. On the contrary, they have a right to speak out in open discussion and criticism thereof, the only test being that they make no false statement. And this is the great safeguard of free government and of pure government. This is fundamental among us;" and again, "while an officer's public acts may be criticized, the publication must not contain a charge against his person or moral character."

And again in *Mayrant v. Richardson*, supra, we find the following as to freedom of speech: "That among those principles deemed sacred in America; among those sacred rights considered as forming the bulwark of their liberty, which the government contemplates with awful reverence, and would approach with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind."

Again, 5 A. L. R. page 1352: "The foundation for an action of libel must be that the words are defamatory or bear a defamatory meaning."

In *Hubbard v. Furman University,* supra, the Court says: "If the publication is not libelous per se, bad motive or malicious purpose to injure the plaintiff is not enough without an allegation that it effected the evil purpose by conveying to those to whom it was sent, a charge injuriously affecting the character or business of the plaintiff."

It is true, indeed, as stated by counsel for the plaintiffs on the argument: "That a citizen is as much entitled to the protection of the Court for his good name as for his property."

If any difference should be made, it ought to be made in favor of the former; but, while the Courts should be prompt in protecting the citizen's good name, they should be careful, also, before proceeding, to be sure that the complaint in an action of this kind does not set out that an attack has been made upon the reputation of such citizen.

The publication in question is as follows:

"To the Citizens of Aiken City and County:

"As is well known, some of the citizens of the city have been earnestly striving for a better observance of Sunday, an effort being made to have the laws of the city conform rather than conflict with the laws of the State.

"To this end a committee from the various churches of Aiken appeared before council, which not only refused this petition, but passed an ordinance which only required closing for two hours on Sunday (10:30 a. m. to 12:30.) So that the city was more wide open on this day than in the past.

"Consequently, the only course open was an appeal to State law. The law was published in the city and county papers. As a result, all places of business were closed for two succeeding Sundays, and then, in open defiance of the State law, one or two opened up, and continued so to do. After due warning had been given, and disregarded, warrants were issued for one of the firms violating the law, and the case was heard before Magistrate Raborn's Court.

"We herewith present the full stenographic report of that trial in order that all the people may know the facts. The defendants admitted the violation of the law, every witness testified to the fact of its violation, and yet in face of all the law and all the evidence the jury brought in a verdict of 'Not guilty.'

"The defendants pleaded that they gave the profits to the Red Cross and exhibited receipts as proof.

"The committee knows full well that the Red Cross, which the people love and to which they gladly contribute with splendid generosity, does not knowingly accept tainted money or money made in their name by violators of the laws, and we believe that all money so received will be returned, if it has not already been returned.

"The defendants made a strong plea of the fact that they kept closed for two hours, 10:30 to 12:30, as provided by

city law; but this is wholly foreign to the issue, as the question was State law, and this absolutely forbids business houses opening on Sunday, drug stores excepted, and that only for sale of medicine to relieve sick and suffering humanity.

"In conclusion * * *

"In view of the law and clear, undisputed evidence, and the admissions of the defendants that they had violated it, does it not seem strange that this jury (of which this plaintiff was a member) should bring in a verdict against all the law and all the evidence—a verdict of 'Not guilty?'

"Let the people of our city and county read the record of this trial, form themselves into a jury, and render a verdict in accordance with the law and the evidence. [Signed] C. K. Henderson, Dr. H. H. Wyman, Sr., Rev. O. M. Abney, Rev. P. J. McLean, Rev. John E. Henderson, Rev. John Ridout, G. Cushman, J. T. Shuler, W. E. Shuler, E. C. Cushman, I. N. Eubanks, C. L. Holley, D. M. George, E. L. Shealey, J. E. Seigler, J. Miton Allen, G. E. Owens, E. C. Barrett."

Applying the foregoing principles to the cases of the three jurors, a bare inspection of the complaint is sufficient to show that the publication is not libelous per se. There is no "charge injuriously affecting the character or business of the plaintiff."

The said report of the proceedings purports to be full and complete, and neither in the argument nor elsewhere was it charged by the plaintiff that such report is unfair, garbled, added to, or taken from. The expressed purpose of such publication was that "all the people may know the facts." The complaints show that defendant, along with 17 other citizens of the city of Aiken, signed the publication. A fair and reasonable construction of such publication reveals the fact that the signers thought that the defendants in the said trial should have been convicted. But nowhere do they say

that any member of the jury returned a dishonest verdict, or that any moral turpitude of any sort prompted their action.

It is true that the plaintiffs have seen fit to construe said publication as charging them with almost every manner and form of moral obliquity described in five subsections of paragraph 9 of the complaint by a battery of adverbs, but these are only the inferences of the pleader, and they are not such inferences as are fairly and reasonably deducible from the language used. Neither do the pleadings set out any facts outside of the publication which would make the same libelous. The Code does not in the latter case relieve the pleader from setting out the facts which he relies upon to make a cause of libel when there is no libel per se. *Hubbard v. Furman University,* supra, 76 S. C. 512, 57 S. E. 478.

There is therefore no cause of libel or slander, either per se or per quod, set out in the complaints, and the demurrers in each of these cases are sustained, and the complaints dismissed; and it is so ordered.

The plaintiffs, Louis D. Oliveros and William Terwilliger, each sued on two causes of action. In their first cause of action they say that each of them were branded as an outlaw by defendant publishing in a newspaper the account of the trial in the Magistrate's Court, or at least a part of it set out in the complaint, and that said statement of defendant published was given while a witness in said trial.

It will be observed from an examination of the complaint that this suit is not based upon defendant's statement on the street, but upon the statement made while a witness, and the subsequent publication of such evidence in a newspaper published in the city of Aiken.

The suit of L. M. C. Oliveros has for its basis the same statement charged against the defendant, and made at the same time, so that the first cause of action in the Louis D. Oliveros and William Terwilliger cases and the one and

only cause of action in the L. M. C. Oliveros case will be considered and determined together.

The publication complained of, as set out in the complaint, is of considerable length and need not be set out here. It purports to be a stenographic report of the evidence taken at the trial heretofore mentioned. Nowhere has it been charged, either in the argument or in the complaint, that so much of it as is set out in said complaint is unfair, garbled, added to, or taken from. It must be assumed, therefore, that as it appears in the complaint the said publication referred to, so far as it goes, is an accurate account of what took place in the Magistrate's Court.

The portion of the proceedings referred to above disclose the fact that defendant, upon the insistent cross-examina-K. Henderson. Dr. H. H. Wyman, Sr., Rev. O. M. Abney, tion of counsel, did make the statement referred to. The plaintiffs deny such statements as false, and a willful, malicious, wanton, etc., defamation of plaintiffs. Webster's New International Dictionary defines outlaw to mean: "A person excluded from the benefits of the law or deprived of its protection." Standing alone and unexplained, such charge might be a libel per se, but no reasonable person, it seems to me, can read the account of the trial as set out in the evidence, made a part of the complaint, and say that defendant meant any more than to charge that plaintiffs were violating the law by opening their place of business and selling goods on Sunday.

I do not deem it necessary to quote authority for the proposition that what was said by defendant as a witness, and on a cross-examination by the counsel for the then defendants, was privileged. As I recall, this was admitted by counsel for the plaintiffs, and it only remains to discuss the point as to whether a later publication of the testimony taken at the trial was also privileged. There is a great deal of authority on this subject. It seems to be settled beyond question that a private individual has

the same right as a newspaper to publish the proceedings of Courts—no more and no less. All the authorities seem to agree, also, that either an individual or a newspaper has the right, with some exceptions, to publish the proceedings of our Courts of justice. "The reason for this rule is that the public have a right to know what takes place in a Court of justice, and unless the proceedings are of an immoral, blasphemous or indecent character, or accompanied with defamatory comments, the publication is privileged." Judge Freeman in *Holmes v. Clisby*, 104 Am. St. Rep. 130, 131. The authorities all agree, however, that if such report is published it must be accurate, fair, and impartial, not garbled, added to, or taken from. No one has a right to take advantage of the privilege allowed to make comments injurious to the reputation or business of another. Some authorities seem to hold, also, that even if the report be accurately published, the publisher is liable if it be done with an intent to maliciously injure another. If the last-mentioned rule be followed strictly, then it seems to me that the plaintiff should be required to allege more than the bare statement that the publication was made with a malicious intent to injure, but should set out, also, the facts upon which such charge is based. Otherwise no newspaper or private individual would be safe in publishing a report of the proceedings of a Court, no matter how fair, accurate, or impartial such report might be, without subjecting himself to an action for libel.

To repeat what was said above from *Hubbard v. Furman University*, supra: "If the publication is not libelous per se, bad motive or malicious purpose to injure the plaintiff is not enough without an allegation that it affected the evil purpose by conveying to those to whom it was sent a charge injuriously affecting the character or business of the plaintiff."

In R. C. L. vol. 17, p. 329, the law is stated to be: "The question whether or not a communication is privileged is primarily a question of law for the Court, where the facts

and circumstances surrounding the publication are not disputed by the parties."

For the purpose of the demurrers, the facts and circumstances set out in the complaint are admitted by the defendant.   It is therefore for the Court in the instant cases to determine whether or not such matters and facts constitute any basis for the action brought by the plaintiffs.

Applying the foregoing principle to the cases before us, the only fact set out to sustain the charge of malice is that the publication in the newspaper was over the protest of the plaintiffs, Louis D. Oliveros and William Terwilliger.   I have found no authority which holds that if a person has a right to publish the proceedings of a Court that an objection to such publication by some one interested will be sufficient to fix a charge of malicious libel on the publisher.   Prima facie, such publication is not libelous, and there is no presumption of malice therefrom.

Again, what is there in the publication "injuriously affecting the character or business of the plaintiff?"   Is it not so plain that he who runs may read that defendant, in speaking of plaintiffs on cross-examination as "outlaws," only meant to convey the idea that plaintiffs were selling goods on Sunday in violation of the State laws, and no more?

See *Shecut v. McDonald,* 3 Brev. 38, 5 Am. Dec. 536. And was this not said while defendant was a witness, and on insistent cross-examination by the same attorney who is now the attorney for the plaintiffs in these cases. and who was then the attorney for the defendants, Louis D. Oliveros and William Terwilliger, in the Magistrate's Court?

The latter in their second cause of action admit selling ice cream and cigars on Sunday, and can they now be permitted to come into Court and claim that their business is being injured because the plaintiff (?) published in the newspaper that they were doing this?   Even though the publication be not privileged, can it be fairly and reasonably inferred from the language used that either of these two young men are

guilty of any moral obliquity? However, from a somewhat extended examination of the authorities dealing with the subject, I am forced to conclude that the publication is privileged, and that therefore the complaints of Louis D. Oliveros and William Terwilliger in their first cause of action, and the complaint of L. M. C. Oliveros, do not sate any cause of action against the defendant, and the demurrers interposed in each of said cases should be sustained and it is so ordered.

The second cause of action in the Louis D. Oliveros and William Terwilliger cases allege that plaintiffs have been damaged in their business and reputation by a statement in the same publication in the following language:

"To the Citizens of Aiken City and County:

"As is well known, some of the citizens of the city have been earnestly striving for a better observance of Sunday, an effort being made to have the laws of the city conform rather than conflict with the laws of the State.

"To this end a committee from the various churches of Aiken appeared before Council, which not only refused this petition, but passed an ordinance which only required closing for two hours on Sunday (10:30 a. m. to 12:30.) So that the city was more wide open on this day than in the past.

"Consequently the only course open was an appeal to State law. The law was published in the city and county papers. As a result all places of business were closed for two succeeding Sundays, and then, in open defiance of the State law, one or two opened up, and continued so to do. After due warning had been given, and disregarded, warrants were issued for one of the firms violating the law, and the case was heard before Magistrate Raborn's Court.

"We herewith present the full stenographic report of that trial in order that all the people may know the facts. The defendants admitted the violation of the law, every witness

testified to the fact of its violation, and yet in face of all the law and all the evidence the jury brought in a verdict of 'Not Guilty.'

"The defendants pleaded that they gave the profits to the Red Cross and exhibited receipts as proof.

"The committee knows full well that the Red Cross, which the people love and to which they gladly contribute with splendid generosity, does not knowingly accept tainted money or money made in their name by violators of the laws, and we believe that all money so received will be returned, if it has not already been returned.

"The defendants made a strong plea of the fact that they kept closed for two hours, 10:30 to 12:30, as provided by city law; but this is wholly foreign to the issue, as the question was State law, and this absolutely forbids business houses opening on Sunday, drug stores excepted, and that only for sale of medicine to relieve sick and suffering humanity.

"In conclusion   *   *   *

"In view of the law and clear, undisputed evidence, and the admissions of the defendants that they had violated it, does it not seem strange that this jury (of which this plaintiff was a member) should bring in a verdict against all the law and all the evidence—a verdict of 'Not guilty?'

"Let the people of our city and county read the record of this trial, form themselves into a jury and render a verdict in accordance with the law and the evidence. [Signed] C. K. Henderson. Dr. H. H. Wyman, Sr., Rev. O. M. Abney, Rev. P. J. McLean, Rev. John E. Henderson, Rev. John Ridout, G. Cushman, J. T. Shuler, W. E. Shuler, E. C. Cushman, I. N. Eubanks, C. L. Holley, D. M. George, E. L. Shealey, J. E. Seigler, J. Milton Allen, G. E. Owens, E. C. Barrett.'

A casual examination of said publication discloses the fact that the words "does not knowingly accept tainted money" is not intended by the signers of the article to charge

the plaintiffs, Louis D. Oliveros and William Terwilliger, as being engaged in any "corrupt, reprehensible, or illegal avocation, or contrary to morality," but such words, when taken together with the part of the article set out in the complaint, evidently and plainly meant that the money contributed by said plaintiffs to the Red Cross was earned by said plaintiffs in doing something that was contrary to law.

In the third paragraph of the complaints the plaintiffs allege that each of them is engaged in the operation of an ice cream parlor and cigar business.

In the fourth paragraph of said complaint they allege that during the months of January and February, 1920, they did keep open and operate their said place of business on each Sunday in each of said months, and contributed the proceeds of such sales to the American Red Cross Association and the Odd Fellows' Orphanage at Greenville, S. C. The said plaintiffs, therefore, while denying that the said moneys contributed to the Red Cross and orphanage was made or earned contrary to law, in said paragraph 4 admit this to be so. It is clear that, no matter what may have been done with the profits, such sales on Sunday were plain violations of sections 698 and 699 of the Criminal Code of this State.

I presume that the said plaintiffs construed the exceptions in section 698 to permit them to sell on Sunday if the proceeds of such sales were devoted to charitable purposes, but, if so, they were in error.

The section plainly prohibits the exercise of any work or business of a person's ordinary calling on Sunday except works of necessity or charity, and from a legal standpoint the sales of ice cream or cigars are neither a work of necessity nor charity.

I desire to be distinctly understood, however. that I do not intend in any degree to cast any reflections on either of the young men referred to. The laws which they were charged with violating, and which in their complaints they

admit, have in many parts of the State been honored more in the breach than in the observance, with the tacit consent and approval of the public.

Now, this has been the case until quite recently in the city of Aiken.   It was not wrong in itself, but wrong because the law prohibited it.   There are few smokers who would hesitate to purchase cigars or cigarettes on Sunday if they happened to need them and had the opportunity to do so.

From the foregoing facts of the case and the law applicable thereto, I cannot escape the conclusion that the said complaints in their second cause of action state no cases against the defendant.

The demurrers in each of said second causes of action must be sustained; and it is so ordered.

In addition to the authorities cited   above   see   also: *McGregor v. State Co.,* 114 S. C. 48, 103 S. E. 84, Starkie on Slander and Libel (Amer. Ed.) ; *Smith v. Bradstreet Co.,* 63 S. C. 525, 41 S. E. 763; *Kee et al. v. Armstrong, Bird & Co.,* 75 Okl. 84, 182 Pac. 494, 5 A. L. R. 1349; *Lawson's Rights and Remedies.*

*Messrs. John Edwin Stansfield, George Bell Timmerman and Wm. M. Smoak,* for appellants.   *Mr. Stansfield cites: Where alleged libelous words are doubtful it is for the jury:* 93 S. C. 475; 76 S. C. 510.   *No violation of Sec.* 698, *Crim. Code: What is a libel:* 93 S. C. 474; 76 S. C. 511; 63 S. C. 530. *Newell Libel and Slander* (1st Ed.) 32, 36, 42; 71 S. C. 116; 4 McC. 321; Dud. L. 310; 3 S. E. 321 (Ga;) 28 N. E. 692 (Ill.)   *Intent is not material:* Newell, 301. *Truth is only a mitigating circumstance.* Sec 215, Code Proc. 1912.   *Complaints should not have been dismissed because no malice could be inferred from publications:* 2 McC. 288; 3 Hill 88. *Privileged communications:* 99 S. C. 443; Newell 388-9; 3 Hill 85; 3 How. 287; 11 L. Ed. 601; 207 Fed. 222; 26 L. R. A. (N. S.) 1088; 12 Pick. (Mass.) 163;

17 R. C. L. Secs. 74, 76, 88; 12 Fed. 526; 22 Fed. 771. *Publication of report of judicial proceeding is privileged unless there be express malice*: 25 Cyc. 406; 17 R. C. L. 344; 51 S. E. 756 (Ga.;) 33 N. E. 921 (N. Y.;) 35 Ann. Cas. 33. *Question of privilege was for the jury*: 99 S. C. 433; 3 Hill 85. *Libel was sufficently alleged*: 99 S. C. 432; 68 S. C. 201; 66 S. C. 17; 87 S. C. 257; *Bryant Code Pleading,* 190; 91 S. C. 424.

*Hendersons,* for respondent. cite: *Libel per se and per quod*: 17 R. C. L. Sec. 4, p. 264; Sec. 54; *Malice*; Id Sec. 64, 65. *Where words are not libelous per se there must be full allegations showing wherein they are libelous*: 76 S. C. 511; 13 Enc. (Pl. & Pr.) 32; 9 Rich. 382; 161 Ala. 292; 114 S. C. 48. *Report of judicial proceeding is privileged*: 17 R. C. L. Sec. 93; 3rd Lawson's Remedies, Sec. 1230, Starkie on Slander, 272; 25 Enc. Pl. & Pr. 376. *Where privilege appears from face of complaint express malice must be alleged*: 13 Enc. Pl. & Pr. 59; 104 Am. St. Rep. 130. *Sunday work prohibited*: Secs. 698, 699, Crim. Code 1912. *Truth of words a complete defense*: Newell on Defamation, p. 651, Sec. 68, 18 A. & E. Enc. Law, (2nd Ed.) 1067; Art 1, Sec. 21, Const. 1895. *Privilege in publication extends to witnesses*: 80 Am. Dec. 740; 97 Am. St. Rep. 830; Newell, 499.

April 16, 1921.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

For the reasons assigned by his Honor, Judge Rice, in circuit decree, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.