### BELL v. CLINTON OIL MILL ET AL.

#### (124 S. E., 7)

1. LIBEL AND SLANDER—STATEMENT THAT COMPANY WAS GOING TO PLACE PLAINTIFF'S ACCOUNT WITH SURETY HELD NOT ACTIONABLE. —A statement to a third person to get word to plaintiff that his company was going to place his account with surety indemnifying company against certain acts of its employees, some of which were not criminal *held* not actionable.

2. LIBEL AND SLANDER—NO INDUCEMENT, COLLOQUIUM, OR INNUENDO NECESSARY, WHERE WORDS IMPUTE CRIME.—Where alleged defamatory words in themselves impute to plaintiff commission of a crime, and it appears that they were spoken of plaintiff, no inducement, colloquium, or innuendo is essential to proper pleading on plaintiff's part.

3. LIBEL AND SLANDER—INDUCEMENT AND INNUENDO ESSENTIAL, WHERE WORDS NOT APPLICABLE TO PLAINTIFF, OR NOT ACTIONABLE PER SE.— The common-law rule was that, if alleged defamatory statement was not on its face applicable to plaintiff or was not actionable *per se*, complaint .must show by what was termed the inducement extrinsic circumstances which, coupled with language used, affected construction and rendered it actionable, by what was termed the colloquium its relation to plaintiff, and by what was termed the innuendo, giving point or meaning to matter expressed in charge,

---

NOTE: On liability of corporation for slander by an agent or employee, see notes in 9 L. R. A. (N. S.), 929; 21 L. R. A. (N. S.), 873; L. R. A. 1916E, 774; 6 B. R. C., 681.

On binding effect of judgment against an actural tort-feasor upon one who is constructively responsible for his tort, see note in L. R. A. 1918E, 232.

On joint liability of master and servant for tort of servant, see notes in 28 L. R. A., 441; 12 L. R. A. (N. S.), 670; 25 L. R. A. (N. S.), 356.

not as stating new facts, but the construction which defendant intended and as bystanders understood, the import of the words used, coupled with the inducement, and under Code Civ. Proc., 1922, § 425, the inducement and innuendo are still essential under the circumstances stated, but colloquium is no longer necessary.

4. INSURANCE—SURETY BOND INDEMNIFYING AGAINST EMPLOYEES' "WRONGFUL CONVERSION" OR "MISAPPROPRIATION," HELD TO INCLUDE ACTS NOT CRIMINAL.—A surety bond, indemnifying against employees' "wrongful conversion" or "misappropriation," *held* to include acts which are not criminal.

5. DISMISSAL AND NONSUIT—MOTION TO DISCONTINUE ACTION AGAINST SERVANT OF DEFENDANT CORPORATION ADDRESSED TO PRESIDING JUDGE'S DISCRETION.—Plaintiff's motion to discontinue action for slander against a corporation and its employee, who alleged defamatory statement, so far as employee was concerned, *held* addressed to presiding Judge's sound discretion, and a refusal to grant the motion was not an abuse of that discretion.

6. CORPORATIONS—JOINT SUIT AGAINST CORPORATION AND OFFICER HELD APPROPRIATE.—A joint suit for slander lies most appropriately against corporation and officer or employee who uttered it.

7. MASTER AND SERVANT—SERVANT LIABLE FOR TORT.—A servant is personally liable for his tort, whether principal is or not.

8. INDEMNITY—MASTER MAY HAVE RIGHT OF ULTIMATE RECOVERY AGAINST SERVANT WHO COMMITTED TORT.—Where a tort is committed by servant under circumstances making both him and master liable, master frequently has right of ultimate recovery over against servant, especially where master is liable, not by reason of active participation in wrong, but constructively because of his relation.

Before DEVORE, J., Richland, October, 1923.   Affirmed.

Action by Theo. A. Bell against Clinton Oil Mill, American Agricultural Chemical Co., and C. F. Matthew.   Judgment for defendants and plaintiff appeals.

*Messrs. Nelson & Mullins,* for appellant, cite: *Error to refuse nonsuit as to defendant Matthew:* 9 R. C. L., 201; 40 L. R. A. (N. S.), 1173. *Difference between slander per se and per quod:* 17 R. C. L., 264. *When language is actionable per se:* 93 S. C., 467. *Not necessary that words charge crime in express terms:* 7 Rich. L., 419; 24 L. R. A. (N. S.), 577. *Meaning of words is for the*

*jury:* 63 Fed., 241; Odgers Libel & Slander, 95; 95 S. C., 98. *Malice presumed from use of slanderous language:* 3 How., 291. *Falsity of defamatory words presumed:* 30 L. R. A. (N. S.), 200. *Where language is actionable per se it imports damage:* 25 Cyc., 490; 137 App. Div. (N. Y.), 688. *Privilege should be complete:* 17 R. C. L.; "Libel & Slander", Sec., 158; 66 S. C., 138; 119 S. C., 237. *Statement not privileged:* Newell Libel & Slander, 3rd Ed. Sec., 577. *Words can be slanderous though uttered in spirit of friendship:* 16 Ann. Cas., 166; 214 U. S., 185; 16 Ann. Cas., 1075; Newell Libel & Slander, 3rd Ed. Sec., 362; Odgers Libel & Slander, Sec., 277. *Malice must be inferred from circumstances:* 3 How., 267; 17 R. C. L. Sec. 168; Malice; 3 Hill, 85. *Corporation itself participated in wrong and is liable in absence of liability of Matthew:* 104 S. C., 866. *Damages can be apportioned among defendants:* 1 Bay., 11. *Repetition of slander by third party admissible:* 103 S. E., 783.

*Messrs. D. W. Robinson, Jr.* and *D. W. Robinson,* for respondent, cite: *Joint suit for slander lies against corporation and employee who uttered it:* 96 S. C., 297; 82 S. C., 315; 119 S. C., 244; Newell Libel & Slander 3rd Ed., 436. *Servant is liable whether principal be or not:* 72 S. C., 472; 25 L. R. A. (N. S.), 343; 17 R. C. L., 381. *When corporation has right of recovery over against servant who uttered slander:* 161 U. S., 327; 67 U. S., 425; 40 L. R. A. (N. S.), 1152; Id. 1177; 71 S. E., 1078; L. R. A., 1918-E, 232. *Right to discontinue suit against one party is in discretion of Court:* 82 S. C., 120; 90 S. C., 127; 106 S. C., 510. *Exception to testimony can only be heard on ground on which it is based at the trial:* 121 S. C. 428; 124 S. C., 345; 92 S. C., 236; 106 S. C., 518; 90 S. C., 372; 90 S. C., 514; Jones Evid. Sec., 893, 894. *Declaration of third employee not competent against defendants:* 120 S. E., 518. *What words are actionable per se:* Newell Libel & Slander, 97; 17 R. C. L., 263, 264, 265; 87 N. C., 302; 2

Brev., 480; 1 N. & McC., 347; 4 McC., 317; 10 Rich., 128; 3 Rich., 342; 116 S. C., 82; 80 Mo., 267. *Words are to be given their ordinary meaning:* 76 S. C., 512; 93 S. C., 475; 116 S. C., 82; Newell, 358. *Extrinsic facts which make words slanderous must be alleged:* 116 S. C., 82; 76 S. C., 511; 17 R. C. L., 395-7; Newell 370, 746, 748. *Appropriation must be accompanied with fraud and intent to constitute crime:* 21 S. C., 355; 98 S. C., 430; 107 S. C., 183. *Qualified privilege:* Newell 477, 479, 575, 579; 17 R. C. L., 345, 359, 356; 119 S. C., 243. *Communications to surety company privileged:* 11 A. L. R., 1012. *Where there is qualified privilege burden of proof is on plaintiff to show slander and malice:* Newell 578, 479; 119 S. C., 243; 3 Hill, 75; Malice; Newell 388, 393; 68 S. C., 312; 17 R. C. L., 322, 323, 312. *Where words are plain it is the duty of the Court to declare them:* 93 S. C., 476; 76 S. C., 513; Newell, 352, 358, 362, 363; 17 R. C. L. 398. *Burden on plaintiff to show malice and damage:* 1029, 1030, 1014. *Corporation could not be guilty if Matthew innocent:* 68 S. E., 1103; 30 L. R. A. (N. S.); 404; 73 S. E., 1062; 9 L. R. A. (N. S.), 880; 2 L. R. A. (N. S.), 764; 142 U. S., 27. *Servant personally liable:* 72 S. C., 472; 2 L. R. A. (N. S.), 379; 48 S. C., 324; 82 S. C., 523; 25 L. R. A. (N. S.), 343; 50 L. R. A., 644; 3 Thomp. Corp. Sec., 4091; 1 A. & E. Enc. L. 2nd Ed., 1134-5; 17 R. C. L., 381; Newell, 459; 65 S. C., 344; 68 S. C., 55. *Verdict should be same against master and servant:* 172 U. S., 552; 17 R. C. L., 429, 30; 54 A. S. R., 438.

July 19, 1924.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

Action for $50,000 damages on account of an alleged slander uttered by one Matthew, an agent of the defendant corporation to one Geiger, another em-

ployee of and concerning the plaintiff, who had been an employee also.    The slanderous words set forth in the complaint were:

"You had better tell Bell that the amount due by him is going to be reported to the bonding company and that he had better pay it up at once."

Matthew, who is also a defendant in the case, was produced as a witness for the plaintiff, and he testified that the statement made by him to Geiger was this:

"You might get word to Theo. (referring to the plaintiff) that the company is going to place his account with the bonding company."

The case appears to have proceeded upon the latter statement as the basis of the action, rather than that alleged in the complaint.    The complaint alleges that by said language the defendants intended to charge, and did thereby charge, the plaintiff with having committed a breach of trust, with having appropriated to his own use money belonging to said corporations, or some one of them, thereby charging him with having committed a felony and a crime against the laws of South Carolina, and that said language was so understood by those who were present and heard it; that the charge was false and malicious, and damaging to his character, etc.

The answer put in issue the material allegations of the complaint, except that they admitted that Matthew spoke the words admitted by him as stated above, but in his private capacity, as a friend of the plaintiff, and with no purpose to injure him.    To understand the connection, an explanation of the circumstances is necessary, as to which there appears to be no controversy, as follows:

From 1914 until August 10, 1922, the plaintiff was employed by the defendant American Agricultural Chemical Company and its various subsidiary corporations as cashier. Beginning, it seems, in July, 1915, the plaintiff was allowed to draw certain amounts of money, as advancements upon

his expense account. By August, 1921, the advancements amounted to $845.12, and his expense accounts to $574.30, leaving a balance due by him of $270.82. About March, 1922, demand was made upon plaintiff for said balance, which he was unable to pay. He, however, made an arrangement with Mr. Darlington, district manager, to pay the indebtedness at the rate of $20 per month. The counsel for the plaintiff say in their printed argument:

"This arrangement was carried out up until the time Mr. Bell left the A. A. Company in August, at which time he had paid $158, leaving a balance due on the account of approximately $300."

Exactly how this balance was arrived at is not explained, nor is it material to the issues. It sufficiently appears that when the plaintiff severed his connection with the company he owed a balance on the account. During the period of the plaintiff's service, the A. A. C. Company held a blanket bond of the National Surety Company, indemnifying it from pecuniary loss which it or its subsidiary companies might sustain "by any act of personal dishonesty, forgery, theft, larceny, embezzlement, wrongful conversion, abstraction, or misapplication," by any of the employees designated in an attached schedule, which included the name of the plaintiff. As soon as the plaintiff left the employment of the company, the treasurer, whose office was in New York, began pressing for a settlement by him of the balance due on the account. On August 11, 1922, he wrote to Mr. Darlington, who was district manager, with offices in Columbia, taking the position that the indebtedness was due to the fact that the plaintiff had not returned certain funds advanced to pay traveling expenses, "in other words, it would appear that these funds were appropriated to his own use, which, of course, allows us to take this matter up with the bonding company," and concludes by saying:

"You might say to Mr. Bell that, unless he liquidates this indebtedness to us by Friday, August 18th, we will

17—S. C. R., 129.

ask the bonding company to reimburse us, and let them make such arrangements with Mr. Bell as they see fit."

Having no reply from Mr. Darlington to that letter, the treasurer wrote him again on August 30th, calling his attention to the letter of August 11th, and saying:

"I am of the opinion that, unless we now ask the bonding company to take this matter up, we will lose any advantage that we now have under the bond. It seems to me that Mr. Bell would much prefer to borrow the amount he owes us and liquidate this indebtedness rather than have the bonding company make demands for the return of our funds. Will you please let me have your opinion in the matter?"

On September 5th Mr. Darlington replied to the letter of August 30th saying:

"Relative to asking the bonding company to make good this amount, would suggest that you look into this carefully, for the reason his indebtedness with this company had the approval of Mr. Jones, who was in authority at that time, and this is not a question of shortage. I am merely giving you this information for what it is worth. You no doubt know how to handle it better than I would, so proceed as you think best in the matter."

On September 12th, the treasurer replied to the letter of the 5th, saying:

"I note your suggestion that the authority of Mr. Jones might have some bearing on our being able to recover from the bonding company,"—and directing Mr. Darlington to make a formal demand upon plaintiff for the balance on the account, and to forward a detailed statement of it for submission to the bonding company, with which he complied. It appears that Mr. Darlington, district manager, and Matthew, his assistant, had joint supervision of such accounts as the plaintiff owed and of claims against the bonding company in connection therewith. The exact date does not appear in the record, evidently after the corre-

spondence referred to between Darlington and the treasurer, dated August 11th, August 30th, September 5th, and September 12th; but about that time Matthew had before him this correspondence, and said to Geiger, another employee, "You might get word to Theo. [referring to the plaintiff] that the company is going to place his account with the bonding company"—manifestly meaning that the company intended to make a claim against the bonding company for the balance due by the plaintiff, as a liability under the bond.

This is the slander of which the plaintiff complains, interpreted by him as a charge that the plaintiff had committed a breach of trust by appropriating to his own use money belonging to the company, and had thereby committed a crime against the laws of South Carolina; in other words, that he had committed a breach of trust with fraudulent intent. The language quoted does not upon its face impute to the plaintiff the commission of a crime; it is therefore not actionable *per se*. If it can be construed as actionable, it must be by reason of extrinsic facts which, taken in connection with the language used, disclose an intention on the part of the utterer to charge the plaintiff with having committed a crime.

The bond indemnified the company from loss on account of certain specified acts of the employee: personal dishonesty, forgery, theft, larceny, embezzlement, wrongful conversion, abstraction, and misapplication of funds. Some of these are essentially violations of the criminal law; others, not. It seems to be assumed by the plaintiff that the fact that the balance of the account due by him was to be demanded of the bonding company as a liability under the bond necessarily implied that the plaintiff had committed a crime, and that, if he did not settle, the bonding company would institute criminal proceedings against him. There may have been some force in this assumption, if the bond

had purported to indemnify the company *only* against loss sustained by the criminal conduct of the employee.

We do not think that the matter can be more clearly and accurately stated than was done by his Honor, the presiding Judge, in his charge to the jury:

"I charge you, as a matter of law, that the assertion here that the plaintiff committed a breach of trust, having appropriated money to his own use, does not state a crime against the laws of South Carolina. A man may appropriate money to his own use without being guilty of a crime, or may commit a breach of trust without committing a crime. Breaches of trust are committed every day in the week, I reckon, and every week in the year, all over this country; but they do not necessarily constitute crimes, and the only way that that act could become a crime would be to do it with fraudulent intention. If a man commits a breach of trust with fraudulent intention, that is a crime; and if you charge a person with committing a breach of trust with fraudulent intention, then you charge him with a crime. But just to say that a man has committed a breach of trust, or that he has appropriated money to his own use, does not state a crime against the laws of this State. \* \* \* There has been so much said about this bond that I charge you, as matter of law, that this bond covers other defaults and shortcomings, so to speak, of a person who is required to give it, besides those things which amount to a crime. The bond says it is given to reimburse the party to whom it is given against any act of personal dishonesty, forgery, theft, larceny, embezzlement, and wrongful conversion. Now, a man may be guilty of a wrongful conversion, and not be guilty of a crime. So, if a man wrongfully converts money to his own use, and does it in such a way as not to subject himself to the charge of violating the criminal law, this bond would cover that; abstraction or misapplication. If a man misapplies money where he should not, it would not necessarily follow that it is a crime; and this bond would

cover that. So, I charge you that this bond covers other shortcomings other than those things that are charged in here as crimes."

The alleged defamatory words, the basis of an ac-2, 3 tion of slander, may or may not in themselves impute to the plaintiff the commission of a crime, making them actionable *per se.* Where they do, and it appears that they were spoken of the plaintiff, no inducement, colloquium or innuendo, as the terms are used, is essential to proper pleading on the part of the plaintiff. The rule at common law was that, if the alleged defamatory statement was not upon its face applicable to the plaintiff or was not actionable *per se,* the plaintiff's complaint must show, by what was termed the inducement, the extrinsic circumstances which coupled with the language used affected the construction and rendered it actionable; by what is termed the colloquium, its relation to the plaintiff; and by what was termed the innuendo, giving point or meaning to the matters expressed before in the charge (the inducement and the colloquium), not as stating new facts, but the construction which the defendant intended and as trinsic circumstances which coupled with the language used coupled with the inducement, the innuendo cannot enlarge, extend, or change. 17 R..C. L., 393. *Hubbard v. University,* 76 S. C., 510; 57 S. E., 478.

By Section 425, Code Civ. Proc. 1922, the colloquium, as above explained, is no longer necessary; but the inducement and the innuendo are as essential, under the circumstances stated, as they were at common law. The slanderous charge claimed by the plaintiff to have been made, the constituent elements of which were the words of Matthew and the extrinsic facts set out in the inducement, explained in the innuendo, was that the plaintiff, having appropriated to his own use money which belonged to the company, had committed a breach of trust with fraudulent intent, a crime under the laws of South Carolina.

The inducement, in the plaintiff's complaint, is clearly insufficient. In the light of the evidence, it should have set out the extrinsic facts showing that the bond covered only defalcations criminal in their essence, and the declaration of the treasurer in his letter to Darlington that the plaintiff had appropriated to his own use money received for traveling expenses, which created a liability of the bonding company to the employees, and which they intended to demand, of which the plaintiff was to be notified; that is to say, if the bond covered only criminal acts of the employee, and the defendant stated that it intended to make demand upon the bonding company for the loss evidenced by the account of the plaintiff, it might be reasonably inferred that the defendant intended to impute to the plaintiff the commission of an act for which the bonding company would be liable, that is a criminal defalcation.

But if the bond covers deficits *free* from criminal intent, as well as those *with* such intent, a mere reference to the demand upon a bonding company for money due by the plaintiff furnishes no inference of an intention to charge the plaintiff with a crime. Neither of these essentials is set forth in the complaint as the inducement. The complaint purports to set out the extrinsic fact that the plaintiff had executed a bond to his employers, signed by a surety company; its terms are admittedly unknown to the plaintiff; it is so stated, and of course they are not set forth; it is simply alleged upon information and belief that the bond was in the usual form of surety bonds, given by employees occupying positions of trust and confidence. The inference claimed is that an infraction of the bond by the plaintiff was of necessity a crime. If this be true, the allegations of the complaint should have developed that fact. They not only fail to develop this essential fact, but indicate the contrary, and plainly imply that a loss accruing from a breach of trust, whether with or without a fraudulent intention, would create a liability under the bond. There

is no reference in the complaint to the other essential of the inducement, the extrinsic facts connected· with the correspondence between the treasurer and Darlington, by reference to which the implication of an ulterior design might be inferred.

The terms of the bond, in evidence, show unmistakably that the liability of the bonding company would not be limited to criminal delicts, but would include, under the head of "wrongful conversion" or "misapplication," the appropriation by an employee of the company's money, under circumstances negativing any fraudulent purpose. Hence, even if the inducement had set forth the correspondence between the treasurer and Darlington, the inference would not be even probable that a crime was intended to be imputed to the plaintiff. The statute relating to a breach of trust is Section 43, Crim. Code 1922:

"Any person committing a breach of trust *with a fraudulent intention* shall be held guilty of larceny."

It is apparent from the terms of the statute that there may be a breach of trust, without a fraudulent intention, which is not a crime under the statute; and so it has been construed by this Court in numerous instances. In *State v. Shirer,* 20 S. C., 394, the Court said:

"A breach of trust is where personal property of appreciable value and of which larceny may be committed is put into the possession of another; and when it is so put into his possession it becomes a trust, and while it so remains, if he conceives the purpose to convert that property to his own use, and does it with intention to deprive the owner of the use of that property, then that is a breach of trust with a fraudulent intent."

In *State v. Butler,* 21 S. C., 353, the defendant secretary of a lodge was indicted for breach of trust with fraudulent intent in appropriating to his own use certain funds of the lodge. The defendant requested the charge:

"The mere fact of not paying over the money by the defendant was not sufficient evidence in itself to convict him of a breach of trust with fraudulent intent."

It was refused by the Circuit Judge, and upon appeal the refusal was held reversible error; the Court saying:

"The object of the breach of trust act, as we have said, was not to make criminal the failure to pay a debt. This often happens from misfortune, or from other causes far removed from fraud or crime; and the mere fact of nonpayment affords no ground whatever upon which to base a charge of larceny or breach of trust. To constitute this offense as to property, there must be an appropriation thereof, *accompanied with a fraudulent purpose* to destroy the right of the true owner. This is not a necessary inference from mere nonpayment, and the defendant was entitled to have it declared to the jury, as a matter of law, that failure to pay, in itself, did not constitute the offense charged."

In *Murray v. Aiken Company,* 37 S. C., 468; 16 S. E., 143, a question raised involved the liability of a bonding company under a bond indemnifying the company against loss by reason of fraud or dishonesty of an employee "amounting to embezzlement or larceny." The Court held that the evidence must have been sufficient to convict the employee in the Court of General Sessions of the offense of breach of trust with a fraudulent intention. After quoting from *State v. Shirer,* 20 S. C., 394, and *State v. Butler,* 21 S. C., 353, holding that all the elements of larceny must exist, except that of depriving the owner of possession, the Court concludes:

"The *animus furandi* must exist. * * * We must be satisfied beyond a reasonable doubt, by the testimony, that this * * * passed into the hand of Murray, * * * and that while so in his hands * * * he, with a fraudulent intent, converted the same to his own use. *It will not be enough, if any of these elements is wanting. They must all exist.*"

In *State v. Barnett,* 98 S. C., 422; 82 S. E., 795, it was held:

"The mere failure to pay the money collected was no evidence of a fraudulent intention."

In *China v. Railroad Co.,* 107 S. C., 179; 92 S. E., 335, it was held:

"Granting that China broke his trust, that he used for his own purposes some $55 of the company's money, yet a Judge is not warranted, upon that showing alone, to infer therefrom as a matter of law that China probably had the secret intent to steal."

See, also, *State v. Posey,* 88 S. C., 313; 70 S. E., 612.

The ancient case of *Sturgenegger v. Taylor,* 2 Brev., 480 (A. D., 1811), is a striking illustration of the principle. The defendant had said of the plaintiff "that those two rascals (meaning the plaintiff and his brother) had killed his (my?) hogs and converted them to their own use"—a much stronger expression than the letter of the treasurer, indicating that the plaintiff had appropriated to his own use certain money advanced to him for a specific purpose. The Court said:

"The only question is whether the words, as laid in the count, authorize a judgment on them, and the Court are all of opinion they do not. * * * They do not point at any particular crime. Perhaps they might have been made to do so by an introductory statement, or averments (the inducement), explained by proper innuendoes, showing the cause and occasion of the speaking, and showing that they must necessarily import an imputation of some crime. The innuendo cannot serve this purpose, unless the introductory matter, connected with the words as laid, will justify the explanation given by the innuendo. In this case, the meaning imputed by way of innuendo is not the meaning which the words, as laid, naturally import. The Court ought not to strain to find an innocent meaning. Neither ought it to strain to find a criminal meaning. The words, as laid, must

be taken to mean that the plaintiff had tortiously killed the defendant's hogs, and converted them to his own use, and had thereby committed a trespass; not a felony. In general, the words would not be understood as conveying a more offensive meaning, as they are laid to have been spoken."

Under the views heretofore expressed in line with his Honor the Circuit Judge's very clear and just conception of the case, he would have been fully justified in directing a verdict for the defendants.

The motion of the plaintiff to discontinue the action so far as the defendant Matthew was concerned was addressed to the sound discretion of his Honor the presiding Judge, and in our opinion it was not only not abused, but was wisely exercised. *State v. Railroad Co.,* 82 S. C., 20; 62 S. E., 1116. *Lumber Co. v. Fountain,* 90 S. C., 127; 72 S. E., 885. *Southard v. Marlboro Ag. Co.,* 106 S. C., 510; 91 S. E., 976.

"A joint suit for slander lies most appropriately against the corporation and the officer or employee who uttered it." *Nunnamaker v. Smith,* 96 S. C., 297, 298; 80 S. E., 465. *Hypes v. Southern Ry.,* 82 S. C., 315; 64 S. E., 395; 21 L. R. A. (N. S.), 873; 17 Ann. Cas., 620. *Switzer v. Am. Ry. Express Co.,* 119 S. C., 244; 112 S. E., 110; 26 A. L. R., 819. Newell on Libel and Slander (3d Ed.); pp. 436, 437.

A servant is personally liable for a tort, whether the principal be or not. *Ellis v. Southern Ry. Co.,* 72 S. C., 472, 473; 52 S. E., 228; 2 L. R. A. (N. S.), 382. *Pullman Co.,* 131 Ky., 142; 114 S. W., 754; 25 L. R. A. (N. S.), 343; 17 R. C. L., 381.

But where a tort is committed by a servant under such circumstances as make both him and the master liable, under some circumstances, especially where the master is liable not by reason of active participation in the wrong, but constructively because of his relation, the master frequently has a right of ultimate recovery over

against the servant who committed the wrong. *Washington Gaslight Co. v. District of Columbia,* 161 U. S., 327; 16 Sup. Ct., 564; 40 L. Ed., 718. Rose's Notes to this case, pages 506, 507, and authorities collated. See, also, note in L. Ed. *Chicago v. Robbins,* 67 U. S., (2 Black) 425; 17 L. Ed., 303. *Scott v. Curtis,* 195 N. Y., 424; 88 N. E., 794; 40 L. R. A. (N. S.), 1152; 133 Am. St. Rep., 811. *B. & O. R. Co. v. Howard County,* 111 Md., 176; 73 Atl., 656; 40 L. R. A. (N. S.), 1177, 1178. *Central of Ga. Ry. Co. v. Macon Ry. & Lt. Co.,* 71 S. E., 1078; 9 Ga. App., 628. *Gadsen v. Crafts & Co.,* L. R. A., 1918E, p. 232 and note, 175 N. C., 358; 95 S. E., 610.

The remaining exceptions are overruled, for the reasons heretofore stated.

The judgment of this Court is that the judgment of the Circuit Court be affirmed.

Messrs Justices Watts, Fraser and Marion concur.

Mr. Chief Justice Gary did not participate.