18738

David L. OSWALT, Respondent, v. The STATE-RECORD
COMPANY, Appellant

(158 S. E. (2d) 204)

*Messrs. Robinson, McFadden & Moore,* of Columbia, *for Appellant,*

*Messrs. Cromer & Louthian,* of Columbia, *for Respondent,*

December 12, 1967.

LITTLEJOHN, Justice:

The plaintiff, Cayce City Policeman David Oswalt, driving a police car while on duty the night of November 8, 1964, attempted to stop a Mr. Jeffcoat, whose driving came to his attention when he straddled a white line and otherwise operated his vehicle improperly. Jeffcoat "shot the gas to it" and sped off. Oswalt pursued and unsuccessfully attempted to pass and block Jeffcoat at speeds ranging from 80 to 90 miles per hour. When it became apparent that Jeffcoat was not going to stop at intersecting Highway 215, Oswalt dropped back and blew his siren. Jeffcoat ran a stop sign at the intersection and crashed broadside into another car, killing the two young occupants. Jeffcoat had been drinking.

The defendant, in its daily newspaper (The State), printed news stories about the incident, in which stories Oswalt was identified as the pursuing officer. In addition, on November 12, 1964, the defendant caused to be published an editorial entitled "Death-Dealing Pursuits" as follows:

"TWO YOUNG MEN of West Columbia were killed Sunday evening when a car being pursued by a police officer disregarded a red light and crashed broadside into their automobile. The policeman is quoted as saying that speeds of the race reached 90 miles an hour.

"This incident carries two lessons: (1) No one should depend on a 'green light' for armor-plated safety, but, as

we have said before, should look to see if no law violator is coming before entering an intersection, and (2) That there is no excuse for police to engage in racing with offenders on the public highways and streets to endanger the lives of citizens—as we have pointed out before.

"We have been informed that the two young men who were killed were of excellent character, yet their lives were wantonly sacrificed to capture a smalltime law violator.

"There is absolutely no rime or reason, sense or justification in these high-speed pursuits, with the modern equipment now installed in every police car. Common sense dictates that pursuing a speeding or recklessly-driven car merely makes the driver's speed that much faster.

"As we have spelled out before, in such cases a policeman could use his radio to call ahead and have the speeding car intercepted, or, having been in position to get the license number, do so and 'lie low', letting the law catch up with the violator in due season.

"The point is always made, in such cases as this, that not to pursue a law-violator in traffic is to give the 'green light' to any and all to disregard all the laws of driving safety. And, admittedly, there is indeed some question here. But there is the more powerful and decisive point that such chasing compounds the danger to innocents and is a matter which, in some way, must be reconsidered by authorities.

"The level of law enforcement, and of law enforcers, has risen steadily in South Carolina in recent years. Like New Yorkers, we would like to think of our police as 'the finest,' but more than technical proficiency and personal courage are needed to warrant that designation. A high sense of responsibility and judgment is essential. Our local, county and state officials should seek out such men and see to it that they are paid adequately for their indispensable efforts to safeguard the community."

Oswalt instituted this action against the defendant, claiming the editorial maliciously libeled him. The defendant offered no evidence and at the end of the plaintiff's case

moved for a directed verdict. The trial judge granted the motion as to punitive damages only and submitted the issue of actual damages to the jury, which returned a verdict for $5000 actual damages. The trial judge denied the defendant's timely motions for judgment notwithstanding the verdict and for a new trial.

By answer in the lower court, and by exceptions in this court, defendant contends: (1) That the editorial is not actionable because it is not false; (2) That even if there is error, the same is not defamatory; and (3) In any event there is no proof of actual malice.

It is the position of defendant that the editorial is privileged, coming within the fair comment rule and coming within the recent rulings of the United State Supreme Court. Additional exceptions allege error in the admission of certain testimony.

We think the appeal hinges on whether publication of the editorial was subject to a qualified privilege. If the publication was subject to a qualified privilege the lower court must be reversed. If the publication of the editorial was qualifiedly privileged plaintiff cannot recover unless he can prove express malice or malice in fact. Malice is not presumed if the communication was qualifiedly privileged.

The defendant newspaper contends that the editorial was subject to a qualified privilege on two separate grounds:
(1) The doctrine of "fair comment", which holds matters of public interest and concern to be legitimate subjects of criticism, and everyone has a right to comment thereon as long as he does so fairly and with an honest purpose.
(2) *The New York Times Co. v. Sullivan* doctrine, 376 U. S. 254, 84 S. Ct. 710, 11 L. Ed. (2d) 686, which limits a State's power to award damages in a libel action brought by a public official against critics of his official conduct.

We are of the opinion that this case should be decided upon a determination of whether the editorial was qualifiedly

privileged as fair comment on matters of public interest and concern subject to criticism.

There is no evidence that the editor or any of the reporters who had anything to do with the reporting of the accident were acquainted with Oswalt. We have searched the record and conclude that the only reasonable inference to be drawn from the whole of the testimony is that plaintiff has failed to prove that the editorial was published with actual malice, and has failed to prove that it was published with knowledge that it was false (if it was) or published with a reckless disregard of whether it was false or not. The facts upon which the editorial is based are stated in the news stories and in the editorial itself sufficiently full that the reader can draw his own conclusions. *Fisher v. Washington Post Co.* (D. C. appeals cases) 212 A. (2d) 335.

The argument that the editorial criticism should have been directed only to the City Council which determined the policy of continued pursuit to apprehension, and the argument that the police officer who merely carried out general instructions, should not be the subject of criticism, are over-simplifications of the issues involved.

It is difficult, if not impossible, to separate the work of City Council which determines the policy, from the work of the police officer who puts the policy into application. One who voluntarily accepts public employment and agrees to carry out the directives of the policy-making body, well knowing its nature and the dangers to the public involved, is in little different position from the declarer of the policy. There is involved a unity of purpose and an agreement to pursue a certain course.

The likelihood of criticism, justified or unjustified, is one of the hazards of public service. If an officer pursues violators until apprehension, occasionally tragedy will result; if an officer abandons pursuit of a law violator, occasionally tragedy will result; in either event, criticism is sure to arise. There is no perfect solution to the problem. The nearest authorities can come to a perfect solution is to em-

ploy good officers and have them apply their best judgment under the circumstances. In applying the policy of pursuit, or abandonment of pursuit, much depends upon the officer's judgment. When one accepts public employment in a position which calls for decisions and judgments to be made, he can expect such judgments to be debated.

The City Manager testified that,

"the basic policy of the City Council was that law violators be removed from the city streets, and in case a pursuit was necessary, that the police officer was to pursue at a reasonably safe distance with the intention of keeping this person in sight, in vision, so that assistance could be called from other law enforcement agencies."

Assistant Chief of Police Jumper testified relative to the plaintiff that,

"his duties were to try to stop this car and get it off the road if possible. He should follow this car and pull up beside it, and get it over, and if he is not able to get up beside it and stay beside it, he is to drop back and follow it until he could radio and get some help to him."

A dozen different police officers acting under the same general instructions might have approached the same task of apprehending Jeffcoat in twelve different ways. Some might have apprehended the law violator without tragedy; others might have been the instrument of even worse tragedy than came to exist. It is the province of citizens and of the defendant to discuss the judgment of the police officer in applying the policy of City Council, and to discuss the wisdom of City Council in declaring the policy. We are not, in this appeal, concerned with which policy is best.

When a citizen holds a public office he becomes subject to criticism; any citizen and any newspaper is privileged to criticize his acts, fitness and qualifications for the office he holds and discuss his work without being liable for damages so long as the criticism is fair and honest, and made without malice. *Cartwright v. Herald Publishing Co., et al.,* 220 S. C. 492, 68 S. E. (2d) 415.

We conclude as a matter of law that the editorial was qualifiedly privileged and involved permissible comment. The motion for a directed verdict should have been granted, and accordingly, judgment shall be entered in favor of the defendant and the lower court is

Reversed.

Moss, C. J. and Lewis and Brailsford, JJ., concur.

Bussey, J., dissents.

Bussey, J. (dissenting).

Being of the view that appellant's motion for a directed verdict was properly refused, I most respectfully dissent, but shall only briefly state my views.

In my view, the true facts giving rise to the news stories and the editorial were neither fully nor truthfully enough set forth in either the news stories or the editorial to enable a reader to draw his own conclusions as to whether the defamatory content of the editorial was justified. While we have no prior decision directly in point factually, I am of the view that under the rationale of all of our prior decisions the issues of whether or not the editorial exceeded the privilege of fair comment and whether there was malice in fact were, under the evidence disclosed by this record, issues for the jury. See numerous cases collected in West's South Carolina Digest, Libel and Slander, Key No. 123(8). Evidence of personal malignity or ill will need not be offered, nor such facts be found, to establish malice in publication of defamatory charges. Malice in fact may be proved by the circumstances of the preparation and publication of defamatory charges, as well as the language of the publication itself, and gross disregard of the rights of the person injured is equivalent to malice in fact. *Fulton v. Atlantic Coast Line R. Co.*, 220 S. C. 287, 67 S. E. (2d) 425.