506 S.E.2d 497

**Sandra Prosser HOLTZSCHEITER, Respondent,**

**v.**

**THOMSON NEWSPAPERS, INC., d/b/a The Florence Morning News, Appellant.**

**No. 24842.**

Supreme Court of South Carolina.

Heard Jan. 5, 1995.

Decided Sept. 22, 1998.

504

E.N. Zeigler, of Zeigler and Graham, of Florence, for appellant.

John S. DeBerry, of Florence, for respondent.

Jay Bender, of Baker, Barwick, Ravenel & Bender, of Columbia, for South Carolina Press Association, as amicus curiae.

FINNEY, Chief Justice:

This is a libel case in which respondent, a private individual, sued appellant, a newspaper, for publishing a statement on a matter of public interest which allegedly defamed respondent. The jury awarded respondent $500,000 actual damages and $1.5 million punitive damages. The trial judge remitted the punitive damage award to $500,000. The newspaper appeals. We reverse the trial judge's refusal to direct a verdict on punitive damages, and remand for a new trial absolute.

This is the second trial and appeal in this matter. See *Holtzscheiter v. Thomson Newspapers, Inc.*, 306 S.C. 297, 411 S.E.2d 664 (1991) (*Holtzscheiter I*). We have granted the newspaper's petition to argue against the precedents of *Holtzscheiter I* and six other cases.[1] We took this unusual step

1. *Capps v. Watts*, 271 S.C. 276, 246 S.E.2d 606 (1978); *Jones v. Garner*, 250 S.C. 479, 158 S.E.2d 909 (1968); *Whitaker v. Sherbrook Distributing Co.*, 189 S.C. 243, 200 S.E. 848 (1939); *Merritt v. Great Atlantic & Pacific Tea Co.*, 179 S.C. 474, 184 S.E. 145 (1936); *Wilhoit v. WCSC*,

because we are cognizant of the confusion generated by *Holtz-scheiter I's* majority and dissenting opinions, and of the need to reconsider many of our defamation cases in light of changing constitutional principles. While we do not overrule these cases outright, we caution the bench and bar that this area of the law is constantly evolving, and consequently all prior decisions must be read in the context of the current state of the law.

## FACTS

Respondent's seventeen year old daughter (Shannon) was murdered. The morning after her body was found the newspaper ran a story which, among other things, quoted Shannon's doctor as saying "... there simply was no family support to encourage [Shannon] to continue her education." Respondent alleges this phrase defamed her.

The doctor testified she told the newspaper's reporter that Shannon lacked *financial* (not family) support to continue her education. There was circumstantial evidence that the paper did not follow its ordinary procedures in the filing and editing of this story in that the jury could have found no one other than the reporter read the entire story pre-publication. In addition, there was evidence that respondent had encouraged Shannon, a high school drop-out, to pursue her G.E.D. in the future.

## COMMON LAW DEFAMATION

 The tort of defamation allows a plaintiff to recover for injury to her reputation as the result of the defendant's communication to others of a false message about the plaintiff. Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct. *See Wilhoit v. WCSC, Inc.*, 293 S.C. 34, 358 S.E.2d 397 (Ct.App.1987) (television broadcast of photo is libel). The statement at issue here is in the form of libel.

 The defamatory meaning of a message or statement may be obvious on the face of the statement, in which case the

---

*Inc.*, 293 S.C. 34, 358 S.E.2d 397 (Ct.App.1987); and *Manley v. Manley*, 291 S.C. 325, 353 S.E.2d 312 (Ct.App.1987).

statement is defamatory *per se.* An example of defamation *per se* is "A is a thief." If the defamatory meaning is not clear unless the hearer knows facts or circumstances not contained in the statement itself, then the statement is defamatory *per quod.* In cases involving defamation *per quod,* the plaintiff must introduce facts extrinsic to the statement itself in order to prove a defamatory meaning. An example of defamation *per quod* is "A had a baby" where the extrinsic fact is that A is unmarried. *See Capps v. Watts,* 271 S.C. 276, 246 S.E.2d 606 (1978).

Whether the majority in *Holtzscheiter I* held the phrase "There was simply no family support to encourage [Shannon] to continue her education" was defamatory *per quod* or defamatory *per se* is unclear. Citing *Nettles v. MacMillan Petroleum Corp.,* 210 S.C. 200, 42 S.E.2d 57 (1947), the majority held that because the words used were ambiguous, respondent could introduce evidence of how the phrase was understood. The passage from *Nettles* that precedes this holding is a discussion of defamation *per quod* which addresses the admissibility of extrinsic facts and of evidence of how the words were understood. It would therefore appear *Holtzscheiter I*'s majority held this case involved defamation *per quod.* The holding, however, is obscured by footnote 5, which asserts the evidence is not "necessary to *supply* a defamatory meaning, but would merely explain whether readers, in fact, interpreted the article to convey a libelous meaning on its face." The *Holtzscheiter I* dissent understood the majority to hold that the statement was defamatory *per se,* not *per quod,* and criticized this holding. Commentators also appear confused about *Holtzscheiter I*'s holding on this issue. *Compare* Hubbard and Felix *The South Carolina Law of Torts* 157 (Supp. 1993) (interpreting *Holtzscheiter I* to hold the "statement . . . could be read as defamatory without resort to extrinsic facts . . . *i.e.,* defamatory *per se*") *with* 20 S.C.Juris. *Libel and Slander* § 3, p. 104, fn. 15 (1993) (interpreting *Holtzscheiter I* to hold the statement was defamatory *per quod* ). We now clarify *Holtzscheiter I*: the statement is defamatory *per quod.* Hence, extrinsic evidence is necessary to prove the defamatory meaning.

Much confusion arises from defamation law's use of the term *"per se"* in two different senses. As noted above,

there is the question whether the statement is **defamatory** *per se* or *per quod.* A separate issue is whether the statement is "**actionable** *per se*" or not.[2] This issue is one of pleading and proof, and is always a question of law for the court. If a defamation is actionable *per se,* then under common law principles the law *presumes* the defendant acted with common law malice [3] and that the plaintiff suffered **general** damages. If a defamation is not actionable *per se,* then at common law the plaintiff must plead and prove common law actual malice and **special** damages.[4] *Capps v. Watts, supra; Lily v. Belk's Dep't Store,* 178 S.C. 278, 182 S.E. 889 (1935).

Further, in assessing the question of actionable *per se* or not, an important distinction is drawn between defamation in the form of libel and that in the form of slander. Libel is actionable *per se* if it involves "written or printed words which tend to degrade a person, that is, to reduce his character or reputation in the estimation of his friends or acquaintances, or the public, or to disgrace him, or to render him odious, contemptible, or ridiculous . . . ." *Lesesne v. Willingham,* 83 F.Supp. 918, 921 (E.D.S.C.1949). In other words, if the trial judge can legally presume, because of the nature of the statement, that the plaintiff's reputation was hurt as a consequence of its publication, then the libel is actionable *per*

2. We strongly discourage use of the term actionable *per quod* and instead suggest the issue be posed as "actionable *per se*" or "not actionable *per se.*"

3. When a publication is actionable *per se* there arises a common law **presumption** of implied malice, sometimes called "malice in law", "legal malice" or "presumed malice" which substitutes for common law **actual** malice. If the defamation is not actionable per se, then the plaintiff must plead and prove common law actual malice, that is "the defendant was activated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious indifference toward plaintiff's reports." *Jones v. Garner, supra.*

4. General damages include such things as injury to reputation, mental suffering, hurt feelings, and other similar types of injuries which are "incapable of definite money valuation." *Whitaker v. Sherbrook Distributing Co., supra.* On the other hand, special damages are tangible losses or injury to the plaintiff's property, business, occupation or profession, capable of being assessed monetarily, which result from injury to the plaintiff's reputation. *Capps v. Watts, supra; Wardlaw v. Peck,* 282 S.C. 199, 318 S.E.2d 270 (Ct.App.1984).

*se. Capps v. Watts, supra.* Essentially, all libel is actionable *per se.* The statement at issue here is in the form of libel and, accordingly, *Holtzscheiter I* held it was actionable *per se,*[5] that is, without pleading or proof of special damages.[6]

In contrast to libel, slander is actionable *per se* only if it charges the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession. *Lesesne, supra; Galloway v. Cox,* 172 S.C. 101, 172 S.E. 761 (1934). While some states limit actionable *per se* libel to the same categories of slander which are actionable *per se,* this is not the law in South Carolina. See, e.g., Hubbard and Felix *The South Carolina Law of Torts* 402 (1990). To the extent *Holtzscheiter I* may be read to impose this limitation on actionable *per se* libel, it is overruled.

Under common law principles, it is presumed respondent suffered general damages and that the newspaper acted with common law actual malice because this case involves libel, which is actionable *per se.* Further, since the law of the case under *Holtzscheiter I* is that the phrase is defamatory *per quod,* the respondent is entitled to introduce extrinsic evidence to prove the phrase's defamatory meaning.

## CONSTITUTIONAL ISSUES

This case involves a claim for general and punitive damages by a private plaintiff against a media defendant in a matter of public interest.[7] Accordingly, the case has constitutional implications and issues. We note that constitutional issues were

---

**5.** The majority labeled the statement "libel *per se*" rather than "actionable *per se*" in determining this issue. This language has led to confusion, especially since it is preceded by a passage from *Prosser on Torts* (also cited in *Capps v. Watts, supra*) discussing a limitation on the actionability *per se* of libel which is not the law in South Carolina. See, e.g., *Lesesne v. Willingham,* 83 F.Supp. 918 (E.D.S.C.1949).

**6.** We note that in *Holtzscheiter I* the Court was not presented with any issue concerning the presumption of common law actual malice.

**7.** The parties characterize the case this way, and we accept their view. *Contra Holtzscheiter I,* Toal, A.J., dissenting (finding this a matter of private concern).

neither raised nor ruled on at the trial level in *Holtzscheiter I* because the newspaper prevailed at the directed verdict stage on common law issues alone. Despite the fact constitutional issues were not before the Court in the first appeal, the dissent engaged in a discussion of them. The unfortunate consequence of this discussion was confusion at the second trial whether the majority's silence on the constitutional issues was an implicit rejection of the dissent's view, and therefore whether certain constitutional issues were foreclosed at the second trial on law of the case grounds, having been implicitly litigated in *Holtzscheiter I*. As we view the record in this second trial, the parties and trial judge felt they were bound by the law of the case, and thus certain constitutional issues were not fully litigated. This erroneous, though understandable, confusion permeated the second trial. We therefore take this opportunity to discuss the constitutional questions implicated by this case.

At common law, defamation was a "strict liability" tort, but where the constitution is involved, the common law rules are altered. For example, since respondent relied on the newspaper's negligence here to establish liability, the constitution requires she prove "actual injury": She may not rely on the common law presumption of general damages [8] arising from a defamation actionable *per se. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In addition, respondent may not constitutionally rely on the common law presumption that the statement was false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Parker v. Evening Post*, 317 S.C. 236, 452 S.E.2d 640 (Ct.App.1994). Finally, in order to recover punitive damages from the newspaper, respondent must prove by clear and convincing evidence that the paper acted with constitutional actual malice, that is, that the paper either realized the statement was false or had serious reservations

---

**8.** See footnote 4, *supra*, for a discussion of the difference between common law general damages and special damages. Where a plaintiff in a constitutional defamation case relies on conduct **less** than constitutional malice, she may not rely on presumed damages but must demonstrate "actual injury". *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Actual injury means not only out-of-pocket losses, but includes injury to reputation, mental suffering and anguish, and personal humiliation. *Gertz, supra.*

about its truth.[9] *Gertz, supra; Deloach v. Beaufort Gazette,* 281 S.C. 474, 316 S.E.2d 139 (1984).

With these considerations in mind, we turn to the issues in this appeal.

## ISSUES

### A. Directed Verdict on Liability

The newspaper asserts it was entitled to a directed verdict on liability for several different reasons. We disagree.

A directed verdict on liability is properly denied where there is any evidence, direct or circumstantial, justifying submission of the issue to the jury. *Washington v. Whitaker,* 317 S.C. 108, 451 S.E.2d 894 (1994).

The newspaper contends it was entitled to a directed verdict because the allegedly libelous statement was a constitutionally protected expression of fact or opinion,[10] or because it was a fair comment on a matter of public interest. *See Oswalt v. State–Record Co.,* 250 S.C. 429, 158 S.E.2d 204 (1967). Neither of these issues were raised below, and may not properly be raised now on appeal. *Beaufort County v. Butler,* 316 S.C. 465, 451 S.E.2d 386 (1994). The paper next contends it was entitled to a directed verdict because respondent failed to meet her burden of proving the statement false, *Hepps, supra,* and because the published statement was substantially true. See, e.g., *Dauterman v. State–Record Co.,* 249 S.C. 512, 154 S.E.2d 919 (1967). Neither issue was raised below and accordingly is not preserved for our review. *Butler, supra.* We note that at this second trial, in fact, the paper expressly waived reliance on substantial truth, apparently believing the

**9.** While common law malice involves a malicious intent or recklessness on the part of the publisher, constitutional malice requires actual knowledge of the publication's falsity or serious reservations about its truthfulness. *See Gertz, supra.* The presumption of common law actual malice cannot substitute for the requirement of proof of constitutional actual malice in a case where the First Amendment is involved. *See, e.g., Sanders v. Prince,* 304 S.C. 236, 403 S.E.2d 640 (1991).

**10.** *But see Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (no separate constitutional protection for opinion).

issue foreclosed by the decision in the first appeal. While the dissent discussed that issue, it was not properly before the Court in that appeal, and therefore, like the other constitutional issues, may be litigated in any subsequent proceeding.

Similarly, the paper argues it was entitled to a directed verdict because respondent failed to produce any evidence of damage to her reputation. The trial court relied on the common law presumption of general damages, and the newspaper failed to raise a constitutional challenge to this presumption.[11] Accordingly, it has not demonstrated reversible error in the trial court's denial of the directed verdict motion on this ground. *Washington v. Whitaker, supra,* (constitutional issues may not first be raised on appeal); *Butler, supra.*

 The newspaper also asserts it was entitled to a directed verdict because respondent, Shannon's mother, failed to prove the statement that Shannon lacked *family* support was "of and about her." *Kendrick v. Citizens & Southern Nat'l Bank,* 266 S.C. 450, 223 S.E.2d 866 (1976). While the general rule is that defamation of a group does not allow an individual member of that group to maintain an action, this rule is not applicable to a small group. 50 *Am.Jur.*2d, *Libel and Slander* § 349 (1995); *Hospital Care Corp. v. Commercial Casualty Ins. Co.,* 194 S.C. 370, 9 S.E.2d 796 (1940) (defamation of a class not actionable by member unless statement has special and personal application to plaintiff). We hold there was evidence from which a jury could have found the statement was "of and about" respondent and thus the directed verdict motion was properly denied. *Washington v. Whitaker, supra; Hospital Care, supra.*

 Finally, the newspaper argues the absence of evidence that it acted negligently in reporting the statement entitles it to a directed verdict. We find some indirect evidence in the record that the newspaper failed to follow its professional standards in this matter. By comparing the inconsistencies in times and sequences of events related by the paper's own witnesses, the jury could have found professional standards were breached in that no one other than the report-

---

11. Therefore we do not reach the question whether respondent presented sufficient evidence of "actual" damages within the meaning of *Gertz* to withstand the directed verdict motion.

er actually read the story before it was published. This was some evidence of negligence, sufficient to deny the newspaper's directed verdict motion. *See Jones v. Sun Publishing Co.*, 278 S.C. 12, 292 S.E.2d 23 (1982) (private plaintiff need show only some measure of legal fault by publisher to withstand directed verdict motion).

We find no reversible error on this record in the trial judge's denial of the newspaper's directed verdict motion on liability.

### B. Punitive Damages

The newspaper contends the trial judge erred in denying its directed verdict motion on the issue of punitive damages. We agree.

In order to withstand the directed verdict motion on the issue of punitive damages, respondent had to present clear and convincing evidence that the newspaper acted with constitutional actual malice. *Gertz, supra; Deloach, supra.* We are required to review the evidence of constitutional actual malice *de novo* pursuant to the United States Supreme Court's decision in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Miller v. City of West Columbia*, 322 S.C. 224, 471 S.E.2d 683 (1996). We find absolutely no evidence the newspaper either knew the statement was false or had serious reservations about its truthfulness when the article was prepared and published. Accordingly, the directed verdict motion should have been granted. *Gertz, supra; Deloach, supra.*

The paper also contends that the punitive damage award was so excessive as to indicate passion, prejudice or caprice on the part of the jury. It therefore argues that the remedy for the punitive damage error must be a new trial absolute. See *Sanders v. Prince*, 304 S.C. 236, 403 S.E.2d 640 (1991). We agree that the proper relief in this case is a new trial absolute, not simply because the issue of punitive damages should never have been submitted to the jury, nor solely because of the size of the award, but also because the parties were denied a fair trial as the result of the confusion generat-

ed by our decision in *Holtzscheiter I*. Accordingly, the judgment below is

**REVERSED AND REMANDED.**

C. TOLBERT GOOLSBY, Jr., Acting Associate Justice, concurs.

TOAL, J., concurring in result in a separate opinion.

A. LEE CHANDLER, Acting Associate Justice, and MOORE, J., dissenting in part in a separate opinion.

TOAL, Justice:

In his majority opinion, the Chief Justice holds that this case should be reversed and remanded with a verdict directed for defendant as to punitive damages and a new trial absolute conducted as to actual damages. I fully concur in this result. Moreover, I believe that there is much merit to the analysis set forth in the majority opinion. It recognizes the error, or at least, the hopeless confusion of *Holtzscheiter I* and attempts to correct it. Further, the opinion attempts to clarify the issues surrounding actionability. Additionally, the opinion takes account of the constitutional issues implicated by defamation actions. In these respects, the majority moves to modernize this state's defamation law. I very much agree with this direction; however, I write separately because I do not believe the majority opinion goes far enough. Because a coherent, consistent, and constitutional approach is lacking in South Carolina defamation law, I would advocate, and propose here, the adoption of a new theoretical framework for analyzing defamation issues.

### INTRODUCTION

It has been written that "there is a great deal of the law of defamation which makes no sense." [1] This statement is particularly applicable to certain areas of South Carolina defamation law, which are mind-numbingly incoherent. Case law in this state presents no clear analytical system for resolving defama-

---

1. W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 111, at 771 (5th ed. 1984).

tion questions. Because a clear framework is lacking, the resolution of disputes often turns on chance, on whatever aspect of defamation law happens to arrest the parties' or court's attention in that case. As a result, the law lacks consistency and predictability, and confounds the bench, the bar, members of the general public, and media personnel who have to make important decisions based on court precedent.

The confusion in South Carolina defamation law has been compounded by the fact that this Court's opinions have not completely taken into consideration the impact of decisions by the United States Supreme Court. Since the 1960's, the Supreme Court has attempted "to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 325, 94 S.Ct. 2997, 3000, 41 L.Ed.2d 789, 797 (1974). The effect of these decisions has been the interweaving of federal constitutional principles into the fabric of state defamation law. Because state defamation rules have become inextricably tied to these constitutional principles, it is not possible to review defamation issues in a state law vacuum.

Given the uncertainty existing in South Carolina defamation law, due to the lack of an analytical model and the failure to generally take account of the Supreme Court's recent opinions, this case presents an opportune moment for this Court to look afresh at how defamation questions should be resolved.

### LAW/ANALYSIS

Defamation law embodies the public policy that individuals should be free to enjoy their reputations unimpaired by false and defamatory attacks. Thus, the focus of defamation is not on the hurt to the defamed party's feelings, but on the injury to his reputation. *See Wardlaw v. Peck,* 282 S.C. 199, 318 S.E.2d 270 (Ct.App.1984). Defamatory communications take two forms: libel and slander. Libel consists of the publication of defamatory material by written or printed words, by its embodiment in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words. Restatement (Second) of Torts § 568 (1977) ("Restatement"). Slander, on the other

hand, consists of the publication of defamatory matter by spoken words, transitory gestures or by any form of communication other than those defined as part of libel. *See id.*

## A. ELEMENTS OF DEFAMATION

The elements of defamation include: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *See* Restatement § 558.

### 1. FALSE AND DEFAMATORY STATEMENT CONCERNING ANOTHER

A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.[2] Restatement § 559.

The defamatory statement must also be false. Under the common law, a defamatory communication was presumed to be false. *See Beckham v. Sun News,* 289 S.C. 28, 344 S.E.2d 603, *cert. denied,* 479 U.S. 1007, 107 S.Ct. 646, 93 L.Ed.2d 702 (1986). However, truth could be asserted as an affirmative defense. *See Ross v. Columbia Newspapers, Inc.,* 266 S.C. 75, 221 S.E.2d 770 (1976). The Supreme Court's holding in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 768–69, 106 S.Ct. 1558, 1559, 89 L.Ed.2d 783, 787 (1986) has modified the common law rule: "[A]t least where a newspaper publishes speech of public concern,[3] a private-figure plaintiff

---

**2.** "In determining the defamatory character of language, the meaning of which is clear or otherwise determined, the social station of the parties in the community, the current standards of moral and social conduct prevalent therein, and the business, profession or calling of the parties are important factors. Thus an imputation may be defamatory as applied to one person at a given time and place, although it would not be derogatory of another person at a different time or in a different place." Restatement § 614 cmt. d.

**3.** The Supreme Court wrote in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* "We have long recognized that not all speech is of equal First Amendment importance. It is speech on matters of public concern that is at the heart of the First Amendment's protection." 472 U.S. 749, 758–59, 105 S.Ct. 2939, 2944–45, 86 L.Ed.2d 593, 602 (1985)

(internal citations omitted). It then quoted *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708, 718–19 (1983):

> The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. [S]peech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.

*Dun & Bradstreet, Inc.*, 472 U.S. at 759, 105 S.Ct. at 2945, 86 L.Ed.2d at 602–03 (citations and quotations omitted).

In determining whether the petitioner's credit report, which it had sent to five subscribers, involved a matter of public concern, the Court referred to factors outlined in *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690, 75 L.Ed.2d at 720: "Whether ... speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." It found that the credit report did not involve a matter of public concern.

This was in contrast to the situation in *Gertz*, which the Court characterized as involving "a matter of undoubted public concern." *Dun & Bradstreet*, 472 U.S. at 756, 105 S.Ct. at 2943, 86 L.Ed.2d at 600. Gertz was an attorney representing a family in a civil action against a Chicago policeman who had been convicted of killing a member of the family. A monthly magazine, *American Opinion*, published an article portraying Gertz as the architect of the "frame-up" of the policeman, whose prosecution was part of a Communist campaign against the police. It described Gertz as a "Leninist," a "Communist-fronter," and an official of the "Marxist League for Industrial Democracy, originally known as the Intercollegiate Socialist Society, which has advocated the violent seizure of our government." *Gertz*, 418 U.S. at 326, 94 S.Ct. at 3000, 41 L.Ed.2d at 797.

*Hepps* involved statements made by *The Philadelphia Inquirer* about the principal stockholder of a corporation, the corporation itself, and a number of franchisees. *The Philadelphia Inquirer* published a series of articles whose theme was that the stockholder, corporation, and franchisees had links to organized crime and had used some of these links to influence the state's governmental processes. The Supreme Court found that the plaintiff was a private figure, and the newspaper articles were of public concern. *Hepps*, 475 U.S. at 776, 106 S.Ct. at 1563, 89 L.Ed.2d at 792. Therefore, the plaintiff bore the burden of proving falsity, as well as fault, before recovering damages against a media defendant for speech of public concern. *Id.* The Court reserved the question of what standards would apply if the plaintiff sued a non-media defendant. *Id.* at 779 n. 4, 106 S.Ct. at 1565 n. 4, 89 L.Ed.2d at 794 n. 4.

In *Milkovich v. Lorain Journal Company*, 497 U.S. 1, 19–20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1, 18 (1990), the Supreme Court further elaborated upon *Hepps*: "[W]e think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations ... where a media defendant is involved. Thus, unlike the statement, 'In my opinion Mayor Jones is a liar,' the statement, 'In my

cannot recover damages without also showing that the statements at issue are false." Whether a communication is reasonably capable of conveying a defamatory meaning is a question of law for the trial court to determine. 51 Am.Jur.2d *Libel & Slander* § 119 (1995).

## 2. UNPRIVILEGED PUBLICATION TO A THIRD PARTY

The second major element of defamation is an unprivileged publication to a third party. *See Riley v. Askin & Marine Co.*, 134 S.C. 198, 132 S.E. 584 (1926). "No matter what a person may write, if it is not published, there is of course no liability, since no one is injured." *Carver v. Morrow*, 213 S.C. 199, 202, 48 S.E.2d 814, 816 (1948). The publication of defamatory matter is its communication, intentionally or by a negligent act, to a third party—someone other than the person defamed. 50 Am.Jur.2d *Libel & Slander* § 235 (1995).

## 3. FAULT ON PART OF PUBLISHER

### a. Fault Bearing on Liability

The third element of defamation is fault on the part of the publisher. The degree of fault a plaintiff must establish depends upon his status as a public or private figure.

### i. Defamation of a Public Figure

In *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court announced, "The constitutional guarantees require, we think, a federal rule that prohibits a public official[4] from recovering

opinion Major Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin,' would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich* rejected the creation of a dichotomy between statements of fact and opinion.

4. "[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597, 605 (1966). In considering the question of whether one is a "public official," the "employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion

damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'[5]—that is, with knowledge that it was false or with reckless disregard[6]

---

occasioned by the particular charges in controversy." *Id.* at 86 n. 13, 86 S.Ct. at 676 n. 13, 15 L.Ed.2d at 606 n. 13.

"In *State v. Crenshaw*, [274 S.C. 475,] 266 S.E.2d 61 (1980), we held policemen were 'officers' within the meaning of the statute prohibiting public officers from accepting bribes. It is both rational and logical to extend this classification to the defamation area. Simply speaking, the status of a public official may be deemed sufficient to warrant application of the *New York Times* privilege, not because of the government employee's place on the totem pole, but because of the public interest in a government employee's activity in a particular context." *McClain v. Arnold,* 275 S.C. 282, 284, 270 S.E.2d 124, 125 (1980) (citations omitted).

5. The Supreme Court in a later case noted, "We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one. In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 2430, 115 L.Ed.2d 447, 468–69 (1991) (citations omitted).

"Actual malice" must be proved with "convincing clarity." *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 729, 11 L.Ed.2d at 710.

6. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubt as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267.

of whether it was false or not." [7] *Id.* at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

*Curtis Publishing Company v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) extended the *New York Times* standard to protect defamatory criticism of "public figures," [8] in addition to "public officials." Hence, public persons "may recover for injury to reputation only on clear and convincing

---

**7.** This Court has on occasion applied the *New York Times* standard. *Stevens v. Sun Publishing Company,* 270 S.C. 65, 72, 240 S.E.2d 812, 815–16, *cert. denied,* 436 U.S. 945, 98 S.Ct. 2847, 56 L.Ed.2d 786 (1978) states: "We believe actual malice is established when reporters and publishers depart from responsible standards of investigation and print articles on the basis of an admittedly unreliable source, without further verification. . . .

"Accordingly, this Court declines to extend constitutional protection to articles containing blatantly false statements and opinions of a biased informant which imply improper conduct by a public official."

**8.** In *Gertz,* the Court explained that the designation of "public figure" may exist in either of two circumstances:

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

It further declared that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

*Time, Inc. v. Firestone* held that Firestone, a prominent individual in Palm Beach, Florida who was involved in a highly publicized divorce proceeding, had not assumed any role of especial prominence in the affairs of society, and she had not thrust herself to the forefront of any particular controversy in order to influence the resolution of issues; therefore, she was not a public figure. 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Further, the case declared that "petitioner seeks to equate 'public controversy' with all controversies of interest to the public. . . . Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public. Nor did respondent freely choose to publicize issues as to the propriety of her married life. She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony." *Id.* at 454, 96 S.Ct. at 965, 47 L.Ed.2d at 163.

proof[9] that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008, 41 L.Ed.2d at 807.

### ii. Defamation of a Private Person

As to the standard of liability for a publisher of defamatory material relating to a private individual, the Supreme Court addressed this question in *Gertz* as well, holding that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz*, 418 U.S. at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809.

The South Carolina Supreme Court has not explicitly addressed this question since the *Gertz* decision was issued. Most jurisdictions require a private-figure plaintiff to prove negligence to recover for defamation. 2 Harper & James, The Law of Torts § 5.0, at 13 (2d ed. 1986); *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 655 A.2d 417, 423–24 n. 1 (1995) (citing 42 jurisdictions where negligence is the standard for private plaintiffs), *cert. denied*, 516 U.S. 1066, 116 S.Ct. 752, 133 L.Ed.2d 700 (1996). I agree this is the appropriate standard of liability to be met by private figures.

### b. Fault Bearing on Damages

Under the United States Supreme Court's cases, the standard of fault also affects the matter of damages. In *Gertz*, the Court declared, "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Gertz*, 418 U.S. at 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 810. In attempting to reconcile state law with the

---

**9.** On appellate review, courts must independently examine the record to determine whether the evidence establishes actual malice with convincing clarity. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

In *Peeler v. Spartan Radiocasting, Inc.*, 324 S.C. 261, 478 S.E.2d 282 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2455, 138 L.Ed.2d 212 (1997), which involved allegedly defamatory statements made about a public figure, we concluded that there did not exist clear and convincing evidence to support a finding of actual malice.

competing interest under the First Amendment, "It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury." [10] *Id.* at 349, 94 S.Ct. at 3012, 41 L.Ed.2d at 811.

In *Dun & Bradstreet, Inc.,* the Court indicated [11] that the First Amendment restriction on damages, as held in *Gertz,* related to what "a private individual could obtain from a publisher for a libel that involved a matter of public concern." *Dun & Bradstreet,* 472 U.S. at 751, 105 S.Ct. at 2941, 86 L.Ed.2d at 597. *Dun & Bradstreet* further recognized that speech on matters of purely private concern is of "less First Amendment concern." *Id.* at 759, 105 S.Ct. at 2945, 86 L.Ed.2d at 603. The case specifically held that "In light of the reduced constitutional value of speech involving no matters of public concern, ... the state interest adequately supports awards of presumed and punitive damages—even absent a showing of 'actual malice.'" *Id.* at 761, 105 S.Ct. at 2946, 86 L.Ed.2d at 603–04. Thus, "permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." *Id.* at 763, 105 S.Ct. at 2947, 86 L.Ed.2d at 605.

*Dun & Bradstreet* suggests, contrary to *Gertz,* that punitive damages may be awarded even absent a showing of actual malice. I would adhere to the *Gertz* standard for a number of

---

**10.** "[A]ctual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz,* 418 U.S. at 350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811.

**11.** *Dun & Bradstreet* did not command a clear majority in limiting *Gertz* to matters of public concern. Justice Powell announced the Court's judgment and wrote an opinion in which Justices Rehnquist and O'Connor joined. Then–Chief Justice Burger concurred in the judgment and agreed that *Gertz* should be limited to statements concerning matters of general public importance. *Id.* at 763–64, 105 S.Ct. at 2948, 86 L.Ed.2d at 605–06 (Burger, C.J., concurring). Although Justice White believed that *Gertz* should be overruled, he nevertheless concurred in the judgment, writing that the defamatory publication in the case did not deal with a matter of public importance. *Id.* at 774, 105 S.Ct. at 2953, 86 L.Ed.2d at 612 (White, J., concurring).

reasons. First, *Dun & Bradstreet* was supported by a slim plurality of the Court; as such, its future viability is questionable. Second, *Dun & Bradstreet* envisioned the possibility of a lower threshold for punitive damages. We are obviously free to select a higher standard for South Carolina. Third, the adoption of an actual malice standard for punitive damages in defamation cases is consistent with our standard in other types of punitive damages cases. Actual malice suggests knowledge of falsity or reckless disregard as to truth or falsity. This does not differ significantly with the frequently enunciated standard, "willful, wanton, or in reckless disregard of the plaintiff's rights." *See Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35 (1996) (In order for a plaintiff to recover punitive damages, there must be evidence the defendant's conduct was willful, wanton, or in reckless disregard of the plaintiff's rights.).

### 4. Actionability or Existence of Special Harm

The greatest confusion in South Carolina defamation law, as evidenced by the present case, surrounds the issues of actionability and special damages. This stems from the fact that South Carolina has deviated from the majority rule by adopting the concept of libel per quod. As a result of this deviation, a host of confusing and inconsistently used terms have appeared in case law: "libelous," "libelous per se," "libelous per quod," "slanderous per se," "actionable," "actionable per se," and "actionable per quod." Only by completely rejecting this deviant formulation and by rejoining the mainstream of defamation law can any clarity be brought to the law in our state.

Traditionally, two classes of statements have been considered actionable without proof of special damages:[12] (1) all libel, and (2) four categories of slander, described as "slander per se." *Lily,* 178 S.C. 278, 182 S.E. 889. These four categories include statements that impute unchastity, a criminal offense, a loathsome disease, or matter incompatible with

---

12. "Stated succinctly, 'general damages' are those which arise by inference of law and need not be proved by evidence, while 'special damages' must always be pleaded and proved...." *Lily v. Belk's Dep't Store,* 178 S.C. 278, 284, 182 S.E. 889, 891 (1935). Special damages are generally of a pecuniary nature. 50 Am.Jur.2d *Libel & Slander* § 375 (1995).

business or trade. Thus, when a statement constitutes libel or falls into one of the four categories of slander, damages are presumed. *See Fitchette v. Sumter Hardwood Co.*, 145 S.C. 53, 142 S.E. 828 (1928); *Merritt v. Great Atlantic & Pacific Tea Co.*, 179 S.C. 474, 184 S.E. 145 (1936). In all other cases—namely, when slander does not fall into the above-named categories—special damages must be established. The reason for this distinction between oral and written defamation is that the latter is much more extensively and permanently injurious to character, and the deliberation necessary to prepare and circulate it evinces greater malice in the defamer. *Galloway v. Cox*, 172 S.C. 101, 172 S.E. 761 (1934).[13]

South Carolina, however, has deviated from the above formulation of actionability by creating distinctions in libel in the form of "libel per se" and "libel per quod": "A libel per se is one which is actionable on its face. A per quod libel, however, is one [which is] not actionable on its face, but becomes so by reason of the peculiar situation or occasion upon which the words are spoken or written." *Oliveros v. Henderson*, 116 S.C. 77, 82, 106 S.E. 855, 857 (1921). If a statement were libelous per quod, the plaintiff would have to present evidence of special damages. *See Costas v. Florence Printing Co.*, 237 S.C. 655, 663, 118 S.E.2d 696, 700 (1961) ("[T]he article published by the appellant was not libelous *per se*, and there being no allegations in the complaint of special damages, and no extrinsic circumstances alleged, which makes the words libelous, no cause of action was stated by the respondent against the appellant in the complaint."). Thus, contrary to the general rule that all libel is actionable, this approach creates a sub-category of libelous statements that condition actionability on the averment of certain facts and circumstances and the demonstration of special damages.

The haze enveloping the issue of actionability, because of South Carolina's departure from the majority approach, grew into an impenetrable miasma of confusion as a result of *Capps v. Watts*, 271 S.C. 276, 246 S.E.2d 606 (1978). *Capps* is a

---

**13.** *See Fonville v. M'Nease*, Dud 303, 310 (1838) ("Words are evanescent; they are as fleeting as the perishing flowers of spring; they are often the results of mere passion; but written slander is to remain; it is to be treasured up by every other malicious man for his day of vengeance...").

paragon of obfuscation. The following excerpts are illustrative: "To be libelous the words, on their face or by reason of extrinsic facts, must tend to impeach the reputation of the plaintiff.... To be actionable, the libel, as a result of its tendency to impeach or injure the plaintiff's reputation, must thereby injure him." 271 S.C. at 281, 246 S.E.2d at 609. "If the libelous publication is actionable without the pleading and proof of special damage, it is said to be 'actionable per se.' If special damage must be pled to maintain an action, the defamation is 'actionable per quod.'" *Id.* "[W]hen viewed in light of the extrinsic facts which have been pled (the inducement), we conclude that the defendant's remarks are susceptible of a libelous construction. Or, stated technically, the defendant's remarks are libelous per quod." *Id.* at 282, 246 S.E.2d at 609. "[W]e do not agree with the defendant's contention that an allegation of special damage is necessary to render a per quod libel actionable." *Id.* at 283, 246 S.E.2d at 610. "[T]he law of this state, as we interpret it, does not require the pleading of special damage simply because a publication is libelous only by reason of extrinsic circumstances." *Id.* "'Actionable per se' simply means that a libelous publication, whether libelous on its face or by reason of extrinsic facts, is actionable without the pleading of special damage. 'Libelous per se' means that a publication is both (1) libelous on its face *and* (2) actionable on its face without the pleading of special damage." *Id.* at 284–85 n. 2, 246 S.E.2d at 611 n. 2.

Even if it is assumed that *Capps* presents a coherent analytical framework (an assumption that may well be unfounded), the framework is so complicated that mortal legal minds cannot be expected to decipher its cryptic allusions, subtle distinctions, and procedural niceties. *Capps* ignored a long line of cases which had neither created the elusive differences between actionability and libel per se that *Capps* attempts to make out, nor required the pleading of special damages for libel per quod.[14] Unfortunately, *Capps* has found support in a few recent cases: *Holtzscheiter v. Thomson*

---

14. *See Brown v. National Home Ins. Co.*, 239 S.C. 488, 491, 123 S.E.2d 850, 851 (1962) ("A libel *per se* is one which is actionable on its face. A *per quod* libel, however, is one not actionable on its face, but becomes so by reason of the peculiar situation or occasion upon which the words are written."); *Costas*, 237 S.C. at 661, 118 S.E.2d at 699 ("If the

*Newspapers, Inc.*, 306 S.C. 297, 300, 411 S.E.2d 664, 665 (1991) ("In determining if proof of special damage is necessary to make a libel actionable, we are guided by our leading case on the subject, *Capps*...."); *Wilhoit v. WCSC, Inc.*, 293 S.C. 34, 40, 358 S.E.2d 397, 400 (Ct.App.1987) ("As our Supreme Court stated in *Capps v. Watts*, the law of this state does not require the pleading of special damages simply because the publication is libelous per quod.") (citations omitted); and *Warner v. Rudnick*, 280 S.C. 595, 313 S.E.2d 359 (Ct.App.1984) (citing *Capps*).

Libel per quod is a deviation; *Capps* is a further aberration upon this deviation. The rule of libel per quod justifiably has been described as "unsound," [15] "mind-boggling," [16] and even "spurious." [17] In *Sauerhoff*, the Fourth Circuit Court of Ap-

---

alleged defamatory words are not actionable on their face, but derive their defamatory import from extrinsic facts and circumstances, such extrinsic facts and circumstances must be set forth and connected with the words charged by proper averment."); *Drakeford v. Dixie Home Stores*, 233 S.C. 519, 105 S.E.2d 711 (1958) (implying that slanderous per se is synonymous with actionable per se, and declaring that words not actionable by their plain and ordinary meaning cannot be made so by innuendo); *Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 72 S.E.2d 453 (1952) (implying that actionable per se is synonymous with slanderous per se); *Spigner v. Provident Life & Accident Ins. Co.*, 148 S.C. 249, 254, 146 S.E. 8, 10 (1928) ("[I]t is evident that the words objected to in the notice are not libelous per se, and there are no allegations in the complaint, of special damages, and no extrinsic circumstances alleged which make the words in the notice libelous; hence, no cause of action is stated...."); *Prickett v. Western Union Tel. Co.*, 134 S.C. 276, 132 S.E. 587 (1926) ("Party promised to pay and refused" was not libelous per se, and, in absence of allegation of special damage or extrinsic facts and circumstances which would render it libelous per se, complaint was insufficient to state a cause of action); *Bell v. Clinton Oil Mill*, 129 S.C. 242, 251, 124 S.E. 7, 10 (1924) ("The rule at common law was that, if the alleged defamatory statement was not ... actionable per se, the plaintiff's complaint must show, by what was termed the inducement, the extrinsic circumstances which coupled with the language used affected the construction and rendered it actionable....").

**15.** *Herrmann v. Newark Morning Ledger Co.*, 48 N.J.Super. 420, 138 A.2d 61, 74 (Ct.App.Div.1958).

**16.** *Sauerhoff v. Hearst Corp.*, 388 F.Supp. 117, 125 (D.Md.1974).

**17.** Laurence H. Eldredge, *The Spurious Rule of Libel Per Quod*, 79 Harv.L.Rev. 733 (1966).

peals referred to it as among the "rustic relics of ancient asininity." *Sauerhoff v. Hearst Corp.*, 538 F.2d 588, 590 n. 1 (4th Cir.1976). The district court in the same case did not have kind words for the subject either: "For herein the irrational animals known as libel 'per quod' and libel 'per se,' and the Merlinesque touchstones which attach to them, must be identified, whether or not their existence can be rationally justified." *Sauerhoff*, 388 F.Supp. at 118. One commentator has written, "[T]he rule of 'libel per quod' was spawned by confusion over such terms as 'actionable per se,' 'libel per se,' 'slander per se,' 'per quod,' and 'innuendo,' in courts that had no clear understanding of the law of defamation, its historical background, and the frequently silly distinctions drawn between slander and libel." Eldredge, at 736.

"[T]he harmful impact of a libel upon its victim is not less in the particular instance where its odious meaning requires resort to extrinsic facts which are known to the recipient of the libel. To require proof of pecuniary damages in such cases as a basis for a cause of action would be to emasculate the action without rational justification." *Herrmann*, 138 A.2d at 74. Why should special damages be presumed because a statement is defamatory on its face, but not be presumed simply because extrinsic facts are needed to establish the defamatory nature of the statement? Principled justification cannot be provided for the existence of the concept of libel per quod, much less the *Capps* variation on this rule.

"The requirement for special damages in the case of 'libel per quod' is clearly contrary to the historical rule as developed in England and to the apparent weight of authority in this country...." 2 Harper & James, § 5.9A, at 84. A growing number of courts have rejected the concept of libel per quod, either explicitly or through the adoption of section 569 of the Restatement of Torts.[18] The Restatement provides: "One

---

**18.** *Spence v. Funk*, 396 A.2d 967 (Del.1978); *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288 (Iowa Ct.App.1985); *Sharratt v. Housing Innovations, Inc.*, 365 Mass. 141, 310 N.E.2d 343 (1974); *Fulton v. Mississippi Publishers Corp.*, 498 So.2d 1215 (Miss.1986); *Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo.1993) (en banc); *Herrmann v. Newark Morning Ledger Co.*, 48 N.J.Super. 420, 138 A.2d 61 (1958); *Matherson v. Marchello*, 100 A.D.2d 233, 473 N.Y.S.2d 998 (1984); *Hinkle v. Alexander*, 244 Or. 267, 417 P.2d 586 (1966) (en banc); *Agriss v.*

who falsely publishes matter defamatory of another in such a manner as to make the publication of a libel is subject to liability to the other although no special harm results from the publication." Restatement § 569. This formulation encapsulates the common law rule that all libel is actionable, eliminating, thereby, the distinction between libel per se and libel per quod. Under such an approach, there is no need to establish special damages for statements that are libel per quod.[19] Adoption of section 569 by this Court would do much to clarify defamation law in this state.

## B. Application of Law to Present Case

As set forth earlier, the elements of defamation include: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *See* Restatement § 558.

### 1. False and Defamatory Statement Concerning Another

A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Restatement § 559. Initially, it is for the trial court to determine whether the communication is reasonably capable of conveying a defamatory meaning. If the question is one on which reasonable minds might differ, then it is for the jury to determine which of the two permissible views they will take. In some cases, imputations are so clearly innocent or so clearly defamatory that the court is justified in

---

*Roadway Express, Inc.,* 334 Pa.Super. 295, 483 A.2d 456 (1984); *Lent v. Huntoon,* 143 Vt. 539, 470 A.2d 1162 (1983); *Denny v. Mertz,* 84 Wis.2d 654, 267 N.W.2d 304 (1978).

**19.** It should be noted that by abolishing the rule of libel per quod, the Court would not be mandating the elimination of the pleading of extrinsic facts and circumstances. Such pleading is still relevant to the first element of defamation, *viz.,* the existence of a false and defamatory statement. Thus, if a statement is not on its face defamatory, then the plaintiff might need to plead and prove extrinsic facts and circumstances that make the statement defamatory. The form of a libelous statement, whether it is defamatory on its face or not, would henceforth have no connection to the matter of special damages.

determining the question itself. *See* Restatement § 614 cmt. d. In making the determination of whether to submit the issue to the jury, the trial court may consider not only the statement on its face, but also evidence of any extrinsic facts and circumstances.

Thus, in the present case, the trial court must determine whether the statement—"there simply was no family support to encourage [Shannon] to continue her education"—is reasonably capable of conveying a defamatory meaning. The statement would convey a defamatory meaning if it tends to harm the reputation of Holtzscheiter as to lower her in the estimation of the community or to deter third persons from associating or dealing with her. If the question is one on which reasonable minds might differ, then the issue would be submitted to the jury (assuming the other elements of defamation have been satisfied).

In addition to being defamatory, the statement must be false. Falsity was presumed under the common law, but this presumption has been altered by the Supreme Court's decision in *Hepps,* 475 U.S. at 768–69, 106 S.Ct. at 1559, 89 L.Ed.2d at 787 ("[A]t least where a newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages without also showing that the statements at issue are false."). Thus, an initial question that must be answered is whether the speech is of public concern. If it is a matter of public concern (at least where a media defendant is involved [20]), the plaintiff must also prove its falsity. If it is a matter of private concern, the plaintiff does not have to prove falsity. The publisher may avoid liability if it successfully proves the statement is true (i.e. the affirmative defense of truth is available to the publisher in any type of case).

I find that the instant statement was not speech of public concern. As the Supreme Court explained in *Dun & Bradstreet,* "It is speech on matters of public concern that is at the heart of the First Amendment's protection." 472 U.S. at 758–59, 105 S.Ct. at 2944–45, 86 L.Ed.2d at 602 (internal citations omitted). The case implied that matters of public concern are those related to the "unfettered interchange of ideas for the bringing about of political and social changes desired by the

---

**20.** *See Milkovich,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1.

people." *Id.* at 759, 105 S.Ct. at 2945, 86 L.Ed.2d at 602–03 (quoting *Connick,* 461 U.S. at 145, 103 S.Ct. at 1689, 75 L.Ed.2d at 718–19). I cannot conceive how the statement "there simply was no family support to encourage [Shannon] to continue her education," is a matter of public concern. It solely relates to a matter of private concern: family support of an individual. Thus, the issue of falsity does not have to be proved by Holtzscheiter in her case, but truth of the statement may be raised by the newspaper as an affirmative defense. *See Holtzscheiter,* 306 S.C. at 309, 411 S.E.2d at 670 (Toal, J., dissenting); *Dauterman v. State–Record Co.,* 249 S.C. 512, 154 S.E.2d 919 (1967).

## 2. UNPRIVILEGED PUBLICATION TO A THIRD PARTY

The next element of defamation is an unprivileged publication to a third party. Shannon's doctor made the statement in issue here to the newspaper's reporter. The newspaper printed this statement. The doctor's statement to the reporter constituted publication to a third party. When the newspaper printed these words, it also engaged in a publication by republishing the potentially defamatory matter. *See* Restatement § 578, cmt. d. Therefore, an unprivileged publication to a third party (newspaper readers) has occurred.

## 3. FAULT ON PART OF PUBLISHER

Next, the fault of the publisher must be considered. The degree of the publisher's fault required to be established by the plaintiff depends upon the status of the plaintiff as a public or private figure. Holtzscheiter is clearly a private figure.

Holtzscheiter obviously is neither a public official, *see New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, nor a public figure, *see Curtis Publishing Company,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, as she does not fall into either of the two *Gertz* public figure categories. Holtzscheiter has not achieved "such pervasive fame or notoriety" that she has become a "public figure for all purposes and in all contexts." *See Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. Nor has she become a public figure by voluntarily injecting herself or being drawn into "a particular public controversy." *Id.* Because Holtzscheiter is a private

figure, this Court may define the appropriate standard of liability for the publisher. *See id.* at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. So long as we do not impose liability without fault, we may define for ourselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. I concur with the overwhelming majority of jurisdictions, which have held that simple negligence is the appropriate standard of proof for a private-figure plaintiff. On remand, as to the liability issue, it must be determined whether the actions of the newspaper were negligent.

As to the issue of punitive damages, I agree that a directed verdict should have been granted to the newspaper. There was not evidence of actual malice—knowledge of falsity or reckless disregard as to truth or falsity. Hence, the issue should not have been submitted to the jury.

### 4. ACTIONABILITY OR EXISTENCE OF SPECIAL HARM

As discussed above, traditionally, two classes of statements have been considered actionable without proof of special damages: (1) all libel and (2) four categories of slander, described as "slander per se," which encompasses statements imputing unchastity, a criminal offense, a loathsome disease, or matter incompatible with business or trade. The allegedly defamatory statement was obviously republished by the newspaper in written form. Thus, it would potentially constitute libel. As such, it is actionable without proof of special damages. The discussion above explains why the adoption of section 569 of the Restatement is necessary. Under section 569, "One who falsely publishes matter defamatory of another in such a manner as to make the publication of a libel is subject to liability to the other although no special harm results from the publication." Therefore, it would not be necessary for the plaintiff to establish special harm.[21] Under such an approach, we need not ever concern ourselves with the difference be-

---

21. If, however, the present action involved not the newspaper's printing of the doctor's statement, but concerned the doctor's statement to the reporter, then Holtzscheiter would have to show special damages. The latter case would involve slander, not libel, and the doctor's statement would not fall into the four slander per se categories for which special damages would be presumed.

tween libel per se and libel per quod because all libel would be treated equally. Thus, in the present libel case, Holtzscheiter would not have to show special damages in order to recover.

## CONCLUSION

Accordingly, I would remand this matter, in light of the principles set forth above, for a new trial on the issue of actual damages. After the plaintiff has presented her case, the newspaper can, of course, offer any defenses it may have, such as the affirmative defense of truth.

In sum, the principal reason why I do not join the majority is not because of defects in the Chief Justice's opinion. He has admirably attempted to resolve the dispute by clarifying the current state of the law. Rather, I am firmly convinced that the present status of our defamation jurisprudence is so convoluted, so hopelessly and irretrievably confused, that nothing short of a fresh start can bring any sanity, and predictability, to this very important area of the law.

CHANDLER, Acting Associate Justice:

I respectfully dissent in part.

Initially, I am in agreement with the majority's thorough discussion of defamation law in general. This discussion clarifies some of the difficult common law and constitutional concepts related to the law of defamation in this State.

In addition, I concur with the majority's finding of "no reversible error on this record in the trial judge's denial of the newspaper's directed verdict motion on liability." As pointed out by the majority, most of the arguments raised by the newspaper on this issue are not preserved for appellate review because they were not raised to and ruled on by the trial judge. I also agree with the majority that those arguments preserved for review are without merit.

Further, I agree the trial judge erred in denying the newspaper's directed verdict motion on the issue of punitive damages. There is no evidence the newspaper either knew the article was false or had serious reservations about its truthfulness when the article was prepared and published.

I disagree, however, with the majority's ultimate conclusion that the case should be remanded for a new trial.

Citing *Sanders v. Prince*, 304 S.C. 236, 403 S.E.2d 640 (1991), the majority holds that the proper relief in this case is a new trial absolute because, in part, the *punitive* damage award rendered by the jury was excessive. However, if the punitive damage award is stricken, as the majority holds it should be, I fail to see why a new trial is required when the *actual* damage award is not, in my opinion, so shockingly disproportionate to the injuries as to indicate that the jury acted out of passion, caprice, prejudice, or other considerations not founded on the evidence. Indeed, the majority makes no finding that the actual damage award was excessive.[1]

In its opinion, the majority also finds that "the parties were denied a fair trial as the result of the confusion generated by [this Court's] decision in *Holtzscheiter I*." I disagree. Although the *Holtzscheiter I* opinion is not as detailed on the law of defamation as the majority's opinion in this case, the *Holtzscheiter I* opinion is not confusing. It merely holds that because proof of special damages was not required, the original trial judge erred in granting the newspaper's motion for a directed verdict on the defamation action.[2]

I also disagree with the majority's interpretation of *Holtzscheiter I*'s finding as to whether the statement at issue was defamatory *per se* or defamatory *per quod*. In my opinion, it is clear the majority opinion in *Holtzscheiter I* found that the statement was defamatory *per se*.

---

**1.** In *Sanders,* the Court held that a new trial on all issues was required because "[t]he measurement of [punitive] damages necessarily depend[ed] on the jury's view of the facts giving rise to liability," and that "in fairness to all parties ... these issues should be tried together before the same fact-finder." *Id.* at 239, 403 S.E.2d at 642. Not so in the case at hand. Here, if the punitive damage award is stricken, the "measurement of punitive damages" is no longer an issue which would require a new trial absolute.

**2.** The opinion also holds (1) the trial judge did not err in granting a directed verdict on the action for intentional infliction of emotional distress, and (2) evidence of how others may have perceived the statement was admissible.

As the majority points out in the case at hand, "[if] the defamatory meaning of a message or statement *may be obvious on the face of the statement* ... the statement is defamatory *per se*." (emphasis supplied). The majority opinion in *Holtzscheiter I* stated: "Although ambiguous, *the newspaper article could be read, on its face*, to charge Holtzscheiter with failing to support her daughter by not encouraging her to continue her education." (emphasis supplied). 306 S.C. at 301, 411 S.E.2d at 666. Consequently, the majority in *Holtzscheiter I* found the statement to be defamatory *per se*.[3]

In summary, I would affirm the jury's award of actual damages but reverse the award of punitive damages.

MOORE, J., concurs.

---

3. In my opinion, the fact that a statement is "ambiguous" does not preclude the statement from being defamatory *per se*. For example, the statement "A's son is a thief" is defamatory *per se*. However, if A has more than one son, the statement is also ambiguous.